**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JOHN EDWARD SANSING,
      *Petitioner-Appellant*,

v.

CHARLES L. RYAN, Director, Arizona Department of Corrections; ERNEST TRUJILLO, Warden, Arizona State Prison - Eyman Complex,
      *Respondents-Appellees.*

No. 13-99001

D.C. No. 2:11-cv-01035-SRB

OPINION

Appeal from the United States District Court
for the District of Arizona
Susan R. Bolton, District Judge, Presiding

Argued and Submitted January 22, 2019
San Francisco, California

Filed May 17, 2021

Before: Marsha S. Berzon, Consuelo M. Callahan, and
Paul J. Watford, Circuit Judges.

Opinion by Judge Watford;
Dissent by Judge Berzon

# SUMMARY[*]

## Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of John Edward Sansing's federal petition for a writ of habeas corpus, governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), in a case in which Sansing pleaded guilty to first-degree murder and was sentenced to death.

Sansing's Claim 1 was predicated on the alleged denial of his Sixth Amendment right to trial by jury. At the time of his trial, Arizona law mandated that the trial judge alone determine whether a sentence of death should be imposed following a conviction for first-degree murder. The United States Supreme Court declared that sentencing scheme unconstitutional in *Ring v. Arizona*, 536 U.S. 584 (2002). On remand for further consideration in light of *Ring*, the Arizona Supreme Court ruled that the denial of Sansing's right to a jury trial during the penalty phase was harmless beyond a reasonable doubt—the standard for review of non-structural constitutional errors under *Chapman v. California*, 386 U.S. 18 (1967).

Noting that the United States Supreme Court has instructed that a federal habeas court need not formally apply both *Brecht v. Abrahamson*, 507 U.S. 619 (1993) (requiring that a federal habeas petitioner must demonstrate that a constitutional error resulted in "actual prejudice"—that is, a

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

"substantial injurious effect or influence" on outcome) and AEDPA/*Chapman*, the panel chose to decide whether the Arizona Supreme Court's application of *Chapman* was objectively unreasonable under AEDPA. Rejecting Sansing's contention that the Arizona Supreme Court's determination was "contrary to" or an "unreasonable application of" clearly established federal law, the panel concluded that fairminded jurists applying the governing beyond-a-reasonable-doubt standard could conclude that the absence of a jury trial did not affect the Arizona Supreme Court's conclusions (a) that any reasonable jury would have found that the murder was committed in both an "especially cruel" and an "especially heinous" manner (Ariz. Rev. Stat. § 13-703(F)(6) (1999)), or (b) that no rational jury would have found the existence of any statutory mitigating circumstances or that Sansing's non-statutory mitigating circumstances were sufficiently substantial to call for leniency.

Sansing's Claim 2 alleged that his trial counsel rendered ineffective assistance in presenting his mitigation defense during the penalty phase. The state post-conviction review (PCR) court held that Sansing failed to establish either deficient performance or prejudice under *Strickland v. Washington*, 466 U.S. 668 (1984). The panel concluded that, as to most of the challenged aspects of counsel's representation, Sansing did not demonstrate that the PCR court's resolution of *Strickland*'s deficient-performance prong was objectively unreasonable; and that as to the remaining aspects of the representation, the PCR court reasonably determined that Sansing did not demonstrate prejudice.

In Claim 8, Sansing alleged that his waiver of the privilege against self-incrimination was not knowing and

voluntary because he was unaware that his admission, during the plea colloquy, that the victim was conscious when he raped her could be used to prove cruelty under § 13-703(F)(6). Affirming the denial of relief as to this claim, the panel observed that the United States Supreme Court has not yet held that the trial court must affirmatively discuss during the plea colloquy the potential impact of a defendant's factual admissions may have on capital sentencing proceedings.

In Claim 4, Sansing asserted an ineffective-assistance-of-counsel claim that used the same factual predicate as Claim 8. The panel concluded that even accepting that counsel rendered ineffective assistance, a fairminded jurist could conclude that Sansing failed to show a reasonable probability he would have received a different sentence.

In Claim 7, Sansing alleged that the Arizona courts violated the Eighth Amendment by applying an impermissible "causal nexus" test when assessing his non-statutory mitigating circumstances. *See Eddings v. Oklahoma*, 455 U.S. 104 (1982), and *McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015) (en banc). The panel held that the sentencing court did not strip the mitigating circumstances of all weight by applying an unconstitutional causal-nexus test. The panel wrote that it is possible that the Arizona Supreme Court applied a rule contrary to *Eddings*, but did not need to resolve that issue because even if the Arizona Supreme Court erred in this regard, Sansing cannot show actual prejudice under *Brecht*.

Dissenting, Judge Berzon would grant the petition as to Claim 1, *Ring* error prejudice, and so would not reach the other challenges to the death sentence discussed in the majority opinion. She wrote that the Arizona Supreme Court

applied the wrong legal standard as to whether the *Ring* error was harmless, so this court owes no deference to its harmlessness determination. She would therefore review under *Brecht* whether the deprivation of the right to a jury determination had a "substantial and injurious effect" on Sansing's sentence, which was satisfied because Sansing presented sufficient evidence to allow a jury to conclude that, because of his crack cocaine use, his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was "significantly impaired." Ariz. Rev. Stat. § 13-703(G)(1). She concurred in the majority's analysis of Claims 4 and 8, relating to the factual basis offered when pleading guilty.

**COUNSEL**

Jennifer Y. Garcia (argued), Assistant Federal Public Defender; Jon M. Sands, Federal Public Defender; Office of the Federal Public Defender, Phoenix, Arizona; for Petitioner-Appellant.

Lacy Stover Gard (argued), Chief Counsel; John Pressley Todd, Special Assistant Attorney General; Mark Brnovich, Attorney General; Office of the Attorney General, Tucson, Arizona; for Respondents-Appellees.

**OPINION**

WATFORD, Circuit Judge:

In 1999, the State of Arizona sentenced John Sansing to death for the murder of Trudy Calabrese.  This appeal arises from the district court's denial of Sansing's federal petition for a writ of habeas corpus, which is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).   The district court granted a certificate of appealability as to five claims, and we later issued a certificate of appealability as to a sixth.  We agree with the district court that Sansing has not shown an entitlement to relief on any of his claims.

## I.  Factual and Procedural Background

Our summary of the facts is drawn from the Arizona Supreme Court's first opinion on direct appeal.  *State v. Sansing*, 26 P.3d 1118, 1122–23 (Ariz. 2001) (*Sansing I*). Sansing's wife, Kara Sansing, provided much of this narrative when she testified during the penalty phase of Sansing's trial.  (Like the parties, we refer to Sansing's family members by their first names to avoid confusion.)

On February 24, 1998, Sansing and Kara were on the fourth consecutive day of heavy crack cocaine consumption. Sansing called Kara throughout the day to discuss the need to obtain money to buy more drugs.  He also informed her that he had purchased crack cocaine, smoked a portion of it, and was saving the rest for her.  Kara returned home from work around 3:20 p.m., and the two immediately smoked the leftover crack cocaine.

That afternoon, Sansing contacted a local church to request delivery of a box of food for his family.  With his

four young children present, Sansing told Kara that he planned to rob whomever the church sent to deliver the food.

Shortly after 4:00 p.m., Trudy Calabrese parked her truck in front of the Sansing home. She entered the house and delivered two boxes of food, chatting with Kara in the kitchen while Sansing signed paperwork verifying the delivery. As Ms. Calabrese turned to leave, Sansing grabbed her from behind and threw her to the floor. With the assistance of Kara, Sansing bound Ms. Calabrese's wrists and legs with electrical cords.

According to Kara, Ms. Calabrese fought "a great deal" and begged Sansing not to hurt her. She pleaded for the children to call the police and prayed for God's help until Sansing gagged her with a sock. Sansing struck Ms. Calabrese twice in the head with a wooden club with enough force to knock her unconscious. He then retrieved her keys and drove her truck to a nearby parking lot. When Sansing returned, Ms. Calabrese was conscious, at least according to Sansing's and Kara's later statements. (Sansing now disputes this fact, pointing to the testimony of a medical examiner who expressed doubt that Ms. Calabrese regained consciousness given the severity of her head injuries.)

Sansing dragged Ms. Calabrese upstairs to his bedroom, where he raped her. Her arms and legs were still bound. Kara overheard Sansing and Ms. Calabrese speaking to each other. (Sansing disputes that Ms. Calabrese spoke, pointing to the use of the gag and again to her head injuries.) After raping Ms. Calabrese, Sansing stabbed her three times in the abdomen with a knife from the kitchen. Kara described Sansing as "grinding" the knife inside of Ms. Calabrese, and the medical examiner saw signs that the knife had been twisted in her abdomen. Ms. Calabrese died from these wounds, likely several minutes after the stabbing.

Sansing took Ms. Calabrese's jewelry and traded it for crack cocaine.

That evening, a pastor of the church called the Sansing home to check on Ms. Calabrese's whereabouts. Sansing gave a false home address and told the pastor that the delivery had never arrived. Sansing later dragged Ms. Calabrese's body to his backyard and attempted to hide it behind a shed under a piece of old carpeting. He washed the club he had used to strike Ms. Calabrese and hid other evidence of the crime.

By the next day, a search party had located Ms. Calabrese's truck; inside was a note with the Sansings' true home address. The police visited the home and found Ms. Calabrese's body in the backyard. Her head was wrapped in a plastic bag that was bound to her neck by ligatures, and the police discovered that she had been blindfolded. At the time of the search, Sansing had already gone to work. He went straight from work to his sister Patsy's house, where he confessed to having killed Ms. Calabrese. Patsy called their father, who reported the murder and Sansing's location to the police. Sansing peaceably surrendered to the officers who arrived at Patsy's house.

The State of Arizona charged Sansing with first-degree murder, kidnapping, armed robbery, and sexual assault. The State also provided notice of its intent to seek the death penalty. Two deputy public defenders, Emmet Ronan and Sylvina Cotto, were appointed to represent Sansing. Professing a desire not to put either his family or the Calabrese family through a trial, Sansing pleaded guilty in September 1998 to all charges in the indictment.

Sansing's trial therefore proceeded directly to the penalty phase, at which the trial judge considered the aggravating and mitigating circumstances associated with the murder. Following a three-day hearing, the trial judge sentenced Sansing to death in a detailed, 17-page special verdict. The Arizona Supreme Court affirmed Sansing's death sentence on direct appeal. *Sansing I*, 26 P.3d at 1132; *State v. Sansing*, 77 P.3d 30, 39 (Ariz. 2003) (*Sansing II*).

Sansing sought post-conviction review (PCR) in state court. The PCR court summarily dismissed four claims on the merits and a fifth claim as procedurally defaulted. The court rejected Sansing's remaining claim, which alleged ineffective assistance of trial counsel, in a reasoned opinion following a four-day evidentiary hearing. The Arizona Supreme Court denied Sansing's petition for review without reaching the merits of his claims.

In 2011, Sansing filed a 29-claim petition for a writ of habeas corpus in federal court. The district court denied his petition and granted a certificate of appealability as to five of Sansing's claims. Sansing filed a timely notice of appeal from the district court's judgment. As noted above, we issued a certificate of appealability as to one additional claim.

## II. Claim 1

We address first the district court's rejection of Claim 1, which is predicated on the alleged denial of Sansing's Sixth Amendment right to trial by jury. At the time of Sansing's trial, Arizona law mandated that the trial judge alone determine whether a sentence of death should be imposed following a conviction for first-degree murder. The United States Supreme Court declared that sentencing scheme unconstitutional in *Ring v. Arizona*, 536 U.S. 584 (2002).

Soon thereafter, the Court granted Sansing's pending petition for a writ of certiorari, vacated the judgment in *Sansing I*, and remanded the case for further consideration in light of *Ring*. *Sansing v. Arizona*, 536 U.S. 954 (2002). On remand, the Arizona Supreme Court ruled that the denial of Sansing's right to a jury trial during the penalty phase was harmless beyond a reasonable doubt. *Sansing II*, 77 P.3d at 36–39. In Claim 1, Sansing alleges that the Arizona Supreme Court's harmless-error determination was "contrary to" or "an unreasonable application of" clearly established federal law. 28 U.S.C. § 2254(d)(1). We begin by providing additional background relevant to the analysis of this claim before turning to the merits.

A

After Sansing pleaded guilty to first-degree murder, Arizona law required the sentencing court to decide whether he should be sentenced to death or life in prison. Ariz. Rev. Stat. § 13-703(B) (1999). (Unless otherwise noted, we cite the 1999 version of the Arizona Revised Statutes.) To make that determination, the sentencing court engaged in a three-step analysis.

First, the sentencing court determined whether the State had proved beyond a reasonable doubt any of the ten statutory aggravating factors that render a defendant eligible for the death penalty. § 13-703(F). In this case, the sentencing court found two such factors had been proved: that Sansing "committed the offense in an especially heinous, cruel or depraved manner," § 13-703(F)(6); and that he "committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value," § 13-703(F)(5).

Second, the sentencing court determined whether Sansing had proved by a preponderance of the evidence any of the five statutory mitigating circumstances. § 13-703(G). As relevant here, Sansing argued that his "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired" by his use of crack cocaine. § 13-703(G)(1). The sentencing court declined to find the (G)(1) mitigating circumstance, given the evidence that Sansing had planned the robbery and attempted to avoid detection "before, during and after the murder."

The sentencing court also assessed the evidence supporting non-statutory mitigating circumstances—that is, any aspect of Sansing's life or any circumstance of the offense "relevant in determining whether to impose a sentence less than death." § 13-703(G). Although Sansing failed to prove the (G)(1) mitigating circumstance, the court considered his drug-induced impairment to be a non-statutory mitigating circumstance. The court also found that Sansing had "accepted responsibility for his actions and [was] genuinely remorseful," and "that he had a difficult childhood and family background." The court gave only minimal weight to Sansing's lack of education and his family's love and support.

Third, and finally, the sentencing court weighed the aggravating factors against the mitigating circumstances to determine whether the mitigating circumstances were "sufficiently substantial to call for leniency." § 13-703(E). The court considered the mitigating circumstances not sufficiently substantial to outweigh the two aggravating factors it had found. The court therefore imposed a sentence of death.

The Arizona Supreme Court affirmed Sansing's death sentence after independently reviewing "the trial court's findings of aggravation and mitigation and the propriety of the death sentence." Ariz. Rev. Stat. § 13-703.01(A) (2001). The court upheld the sentencing court's finding that the murder had been committed in an especially cruel manner, which was sufficient on its own to sustain the (F)(6) aggravating factor, and chose not to reach whether the murder was also heinous or depraved. *Sansing I*, 26 P.3d at 1127–29. The court struck the (F)(5) aggravating factor because the facts did not "clearly indicate a connection between a pecuniary motive and the killing itself." *Id.* at 1124–27. The court agreed that Sansing had not established the level of impairment required for the (G)(1) mitigating circumstance. *Id.* at 1130–31. Independently reweighing the evidence, the Arizona Supreme Court concluded that a sentence of death was appropriate "[g]iven the strength of the [remaining] aggravating factor in this case and the minimal value of the mitigating evidence." *Id.* at 1131.

As noted above, a year after *Sansing I*, the United States Supreme Court ruled Arizona's judge-based capital-sentencing scheme unconstitutional in *Ring v. Arizona*. "Because Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,'" the Court explained, "the Sixth Amendment requires that they be found by a jury." *Ring*, 536 U.S. at 609 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 494 n.19 (2000)).

To address the fallout from *Ring*, the Arizona Supreme Court consolidated all pending direct appeals in capital cases, including Sansing's. *State v. Ring*, 65 P.3d 915, 925 (Ariz. 2003) (*Ring III*). The court held that a *Ring* error is not structural and thus can be subject to harmless-error

review.  *Id.* at 936; *see Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam) (noting that the Supreme Court left this issue open in *Ring*).  Under the legal standard announced by the Arizona Supreme Court, a *Ring* error is deemed harmless if (1) the evidence supporting an aggravating factor is so overwhelming that "no reasonable jury would have failed to find the factor established beyond a reasonable doubt," and (2) "no reasonable jury could find that the mitigation evidence adduced during the penalty phase is sufficiently substantial to call for leniency."  *Ring III*, 65 P.3d at 944, 946 (internal quotation marks omitted).  In other words, the court stated, "[u]nless we conclude beyond a reasonable doubt that a jury would impose a death sentence, we must remand the case for resentencing."  *Id.* at 944 (citing *Neder v. United States*, 527 U.S. 1, 19 (1999)).

In *Sansing II*, the Arizona Supreme Court applied this harmless-error standard to Sansing's death sentence.  As to the (F)(6) aggravating factor, which applies if the defendant committed the murder in an especially heinous, cruel, or depraved manner, the court held that the error under *Ring* was harmless beyond a reasonable doubt.  The court based that holding on two independent grounds.  First, given the facts to which Sansing had admitted when pleading guilty and to which he had stipulated during the sentencing phase, *see Sansing II*, 77 P.3d at 33–34 n.3, the court concluded that "any reasonable jury would have found that Sansing murdered [Ms. Calabrese] in an especially cruel manner." *Id.* at 35.   Second, "[g]iven the overwhelming and uncontroverted evidence," the court determined that "any reasonable jury would have concluded that Sansing inflicted gratuitous violence upon [Ms. Calabrese], who was rendered helpless" during the crime.  *Id.* at 36.  As a result, "[n]o reasonable jury could have failed to find that [Ms. Calabrese's] murder was especially heinous."  *Id.*

Shifting focus to Sansing's mitigating evidence, the Arizona Supreme Court held, beyond a reasonable doubt, that "[n]o reasonable jury would have concluded that Sansing met his burden to establish" either of the statutory mitigating circumstances he sought to prove (age and significant impairment due to drug use). *Id.* at 37–38. As to Sansing's non-statutory mitigating circumstances, the court concluded that "no reasonable jury could have given more than minimal weight" to most of the mitigating evidence Sansing relied on, although the court assumed that a reasonable jury "would have accorded some weight to Sansing's family's love and support and to the fact that he accepted responsibility for his crime." *Id.* at 39. But, considering the "brutality" of Ms. Calabrese's murder and the relatively weak mitigating evidence offered by Sansing, the court determined beyond a reasonable doubt that "any reasonable jury would have concluded that the mitigating evidence was not sufficiently substantial to call for leniency." *Id.* The Arizona Supreme Court therefore affirmed Sansing's death sentence.

B

We turn now to the merits of Claim 1. The parties agree that Sansing was not afforded the jury-trial right announced in *Ring*, so the only issue is whether this error was harmless. At the outset, the parties dispute the scope of the rule established in *Ring*. Sansing contends that, like the Arizona Supreme Court, we should consider whether any rational jury, after weighing the aggravating factors against the mitigating circumstances, would have returned a sentence of death. The State responds that *Ring* established only that one or more aggravating factors must be found by the jury— nothing more. According to the State, we need ask only whether it is clear, beyond a reasonable doubt, that

overwhelming and uncontroverted evidence established the (F)(6) aggravating factor, such that no rational jury would have failed to find it.

The district court agreed with the State, reasoning that "[t]o the extent the Arizona Supreme Court chose to include review of mitigation as part of its harmless error analysis, it did so as a matter of state law." The court therefore limited its analysis to the evidence supporting the aggravating factors, and concluded that the evidence of cruelty, heinousness, and depravity underlying the (F)(6) aggravating factor was so strong that Sansing was not prejudiced by the *Ring* error. The court also held, albeit without further analysis, that the Arizona Supreme Court's "review of the mitigating evidence, while not required by *Ring*, was thorough, and its assessment of the evidence was not objectively unreasonable."

Months after the district court rejected Claim 1, we adopted a broader reading of *Ring* in *Murdaugh v. Ryan*, 724 F.3d 1104 (9th Cir. 2013). *Murdaugh* acknowledged that a narrow reading of the Supreme Court's decision "would extend the Sixth Amendment right no further than its express holding by concluding that a defendant only has a right to have a jury determine aggravating factors." *Id.* at 1115. But we nonetheless defined the scope of the right more broadly to include the "determination that 'there are no mitigating circumstances sufficiently substantial to call for leniency.'" *Id.* Thus, harmless-error review must encompass not only the finding of aggravating factors, but

also "the existence or absence of mitigating circumstances." *Id.* at 1117.[1]

To establish prejudice, a federal habeas petitioner must demonstrate that a constitutional error resulted in "actual prejudice"—that is, a "substantial and injurious effect or influence" on the outcome. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). In *Murdaugh*, we applied the *Brecht* standard "without regard for the state court's harmlessness determination." 724 F.3d at 1118 (quoting *Pulido v. Chrones*, 629 F.3d 1007, 1012 (9th Cir. 2010)). That approach is no longer sound after *Davis v. Ayala*, 576 U.S. 257 (2015). There, the Supreme Court repudiated our approach and clarified that *Brecht* does not "abrogate[] the limitation on federal habeas relief that § 2254(d) plainly sets out." *Id.* at 268. So when, as here, the state court has determined on direct appeal that an error was harmless beyond a reasonable doubt—the standard required for review of non-structural constitutional errors under *Chapman v. California*, 386 U.S. 18 (1967)—a federal habeas petitioner must demonstrate that the court "applied *Chapman* in an objectively unreasonable manner." 576 U.S. at 269 (internal quotation marks omitted).

Although satisfying AEDPA's requirements remains a precondition to relief, the Supreme Court has instructed that we "need not formally apply both *Brecht* and AEDPA/*Chapman*," since the analysis under both approaches will lead to the same result. *Id.* at 268 (internal quotation marks and alteration omitted). If the constitutional

---

[1] We need not decide whether the Supreme Court's decision in *McKinney v. Arizona*, 140 S. Ct. 702 (2020), calls into question this aspect of *Murdaugh*'s holding, since we conclude below that the State is entitled to prevail in any event.

error caused "actual prejudice" under *Brecht*, then a state court's determination that the error was harmless under *Chapman* will necessarily be objectively unreasonable under AEDPA. *Deck v. Jenkins*, 814 F.3d 954, 985 (9th Cir. 2016). By the same token, if a state court's determination of harmlessness survives review under AEDPA, then no actual prejudice could be found under *Brecht*. *Sifuentes v. Brazelton*, 825 F.3d 506, 535 (9th Cir. 2016).

We choose to decide here whether the Arizona Supreme Court's application of *Chapman* was objectively unreasonable under AEDPA. That determination requires us to ask whether "fairminded jurists" could agree with the Arizona Supreme Court's conclusion in *Sansing II* that the *Ring* error was harmless beyond a reasonable doubt. *Ayala*, 576 U.S. at 269. If so, relief is precluded under 28 U.S.C. § 2254(d)(1). In our view, fairminded jurists applying the governing beyond-a-reasonable-doubt standard could conclude that the absence of a jury trial did not affect either the finding of the (F)(6) aggravating factor or the determination that the mitigating evidence was not sufficiently substantial to call for leniency.

1. *Finding of the (F)(6) aggravating factor*. The Arizona Supreme Court reasonably concluded that, given the overwhelming and uncontroverted evidence, any reasonable jury would have found that the murder was committed in both an "especially cruel" and an "especially heinous" manner. *Sansing II*, 77 P.3d at 33–36. Either finding is sufficient on its own to establish the (F)(6) aggravating factor. *State v. Gretzler*, 659 P.2d 1, 10 (Ariz. 1983).

Under Arizona law, a murder is committed in an especially cruel manner if "the victim consciously experienced physical or mental pain prior to death." *Sansing II*, 77 P.3d at 33 (quoting *State v. Trostle*, 951 P.2d 869, 883

(Ariz. 1997)). The victim need not be conscious, however, when "each and every wound" is inflicted. *Id.* (quoting *State v. Lopez*, 786 P.2d 959, 966 (Ariz. 1990)).

Here, the Arizona Supreme Court found cruelty established on three different grounds. The first was the mental anguish Ms. Calabrese suffered before Sansing struck her in the head with the wooden club, when he tackled her, threw her to the ground, and tied her up. As the court stated, Ms. Calabrese's "defensive wounds, her pleas for help, and her attempts to resist Sansing's attack leave no doubt [she] suffered mental anguish as she contemplated her ultimate fate." *Id.* at 34. The second ground was the mental and physical suffering Ms. Calabrese endured when Sansing raped her while her arms and legs remained bound. *Id.* And the third ground was the physical pain Ms. Calabrese endured as a result of the "substantial" blows to her head, which caused "tremendous bleeding," and the three stab wounds to her abdomen, which struck the inferior vena cava and penetrated her colon, stomach, large intestine, and kidney—wounds that the medical examiner testified "would have caused pain and would not have resulted in immediate death." *Id.* Fairminded jurists could conclude, beyond a reasonable doubt, that the evidence of at least one and likely all three of these grounds was overwhelming.

Sansing's principal argument in response is that a rational jury could have found that Ms. Calabrese did not regain consciousness after he delivered the blows to her head, which would mean that she was not conscious when he raped and stabbed her. That contention, of course, does not negate the first of the grounds on which the Arizona Supreme Court based its cruelty determination. But the Arizona Supreme Court reasonably rejected Sansing's factual contention in any event. The evidence Sansing relies

on—the testimony of the medical examiner who performed Ms. Calabrese's autopsy—is itself equivocal. The medical examiner did testify that he doubted Ms. Calabrese regained consciousness after the blows, but he also stated that it was not "medically unlikely or impossible" that she did. Both Sansing and Kara made statements affirmatively establishing that Ms. Calabrese did regain consciousness. Sansing told a reporter who interviewed him following his arrest that Ms. Calabrese had regained consciousness by the time he returned to the house after moving her truck, and that "after beating her so badly, he decided to kill her to end her suffering." According to the reporter, Sansing said: "She was suffering. I wanted to end it. . . . I wasn't playing God. I just couldn't handle seeing the condition she was in." And Kara testified during the penalty phase that Ms. Calabrese was conscious during the rape, which occurred after Sansing inflicted the blows to her head. Fairminded jurists could conclude that, in the face of these admissions from Sansing and Kara, no rational jury could have found that Ms. Calabrese remained unconscious throughout almost the entirety of the attack.

Sansing's argument concerning the cruelty finding suffers from a lack of supporting legal authority as well. Sansing contends that under Arizona law the victim must have been conscious at the time of death, but the principal authority he relies on, *State v. Wallace*, 728 P.2d 232, 237 (Ariz. 1986), did not accurately state Arizona law at the time of his sentencing. As the Arizona Supreme Court held in *Sansing I*, "cruelty can exist even if the victim remained conscious for only a short period during the attack." 26 P.3d at 1127; *see also State v. Schackart*, 947 P.2d 315, 325 (Ariz. 1997). Ms. Calabrese was indisputably conscious for at least a portion of the attack at issue here.

The Arizona Supreme Court's conclusion as to heinousness is also reasonable.  Under Arizona law, the trier of fact considers the following factors in determining whether the defendant committed the murder in an especially heinous manner: "(1) relishing of the murder by the defendant; (2) infliction of gratuitous violence; (3) needless mutilation; (4) senselessness of the crime; and (5) helplessness of the victim."  *Sansing II*, 77 P.3d at 35 (citing *Gretzler*, 659 P.2d at 11).  A finding of helplessness "in conjunction with another *Gretzler* factor, such as gratuitous violence," is sufficient to establish that the murder was especially heinous.  *Id.* at 36.  The helplessness factor is present "when a victim is physically unable to resist the murder."  *Id.* at 35 (citing *State v. Gulbrandson*, 906 P.2d 579, 602 (Ariz. 1995)).  Gratuitous violence consists of "violence beyond that necessary to kill."  *Id.* (citing *State v. Rienhardt*, 951 P.2d 454, 465 (Ariz. 1997)).

Here, as the Arizona Supreme Court concluded, "[o]verwhelming and uncontroverted evidence establishes beyond a reasonable doubt that Sansing inflicted gratuitous violence upon [Ms. Calabrese], a helpless victim."  *Id.* at 36.  Ms. Calabrese was helpless to defend herself because Sansing bound her wrists and legs with electrical cords.  Sansing inflicted gratuitous violence upon her because "[t]he rape, facial wounds, neck ligatures, gagging, blind-folding, and grinding of the knife constitute violence beyond that necessary to kill."  *Id.*

2. *Assessment of the mitigating circumstances*.  The Arizona Supreme Court reasonably concluded, beyond a reasonable doubt, that no rational jury would have found the existence of any statutory mitigating circumstances or found that Sansing's non-statutory mitigating circumstances were sufficiently substantial to call for leniency.  *Id.* at 36–39.

As to the statutory mitigating circumstances, Sansing attempted to prove, based on his consumption of crack cocaine before the murder, that his "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired." Ariz. Rev. Stat. § 13-703(G)(1). Sansing presented evidence that he consumed a large quantity of crack cocaine in the four days leading up to the murder. Drug use can constitute a mitigating circumstance under § 13-703(G)(1), but only if the defendant can show, typically through expert testimony, that a causal nexus exists between his ingestion of drugs and his commission of the offense. *Murdaugh*, 724 F.3d at 1119. The Arizona Supreme Court reasonably concluded that Sansing "failed entirely" to make that showing. *Sansing II*, 77 P.3d at 37. Most glaringly, Sansing did not present any expert testimony establishing the requisite causal nexus, *see id.*, which distinguishes this case from our decision in *Murdaugh*, where such evidence had been presented. *See* 724 F.3d at 1121 (noting that the record included "expert testimony establishing a direct causal link between Murdaugh's drug use and the murder"); *see also id.* at 1119. The Arizona Supreme Court also reasonably concluded that none of the other evidence Sansing presented, including Kara's testimony about their drug use on the day of the murder, was sufficient to allow a reasonable jury to find that Sansing's crack cocaine use caused the level of impairment that the (G)(1) mitigating circumstance requires. *Sansing II*, 77 P.3d at 37.

Although the lack of evidence supporting a causal nexus was alone fatal to Sansing's claim, the Arizona Supreme Court noted additional deficiencies that would preclude a reasonable jury from finding the existence of the (G)(1) mitigating circumstance. The court concluded that the "deliberate actions" Sansing took in carrying out the crime,

which were proved by uncontroverted evidence, "refute his impairment claim." *Id.* at 38. For example, Sansing devised a plan that involved robbing the person who would deliver a charitable gift of food, and he "contacted two different churches in his attempt to lure an unsuspecting victim to his home." *Id.* Far from supporting his impairment claim, these and the other actions Sansing took, such as driving Ms. Calabrese's truck to a nearby parking lot after the initial attack, "establish that the drug use did not overwhelm Sansing's ability to control his conduct." *Id.*; *see also State v. Kiles*, 857 P.2d 1212, 1229 (Ariz. 1993).

The Arizona Supreme Court further relied on uncontroverted evidence establishing that Sansing took steps to avoid detection after committing the murder. He moved Ms. Calabrese's truck away from his home, and when a church pastor called later that night to inquire about Ms. Calabrese, "Sansing gave him a false address and told him that [Ms. Calabrese] never arrived." *Sansing II*, 77 P.3d at 38. In addition, Sansing washed blood from the club that he used to perpetrate the initial attack, and he attempted to hide Ms. Calabrese's body after the murder. These steps to thwart discovery of the crime, the Arizona Supreme Court reasonably concluded, "negate any possibility that a reasonable jury would find that Sansing's capacity to appreciate the wrongfulness of his conduct was significantly impaired." *Id.*; *see also Rienhardt*, 951 P.2d at 466.

In short, while we acknowledge that fairminded jurists could disagree on this point, we think the Arizona Supreme Court reasonably concluded, beyond a reasonable doubt, that no rational jury would have found the existence of the (G)(1) mitigating circumstance. The "possibility for fairminded disagreement" requires us to defer to the state court's determination, regardless of whether we would have reached

the same conclusion following an independent review of the record.  *Harrington v. Richter*, 562 U.S 86, 103 (2011).

As to the non-statutory mitigating circumstances, Sansing highlighted his impairment at the time of the murder and the fact that several family members attributed Sansing's violent conduct to his drug use.  Sansing also emphasized his deep remorse and his decision to accept responsibility for his crimes by pleading guilty.  In addition, Sansing submitted a report by a mitigation specialist that detailed his dysfunctional family background.  The report noted that as a child Sansing witnessed frequent incidents of domestic violence between his mother and stepfather, that he began using drugs in the fifth grade, and that he dropped out of high school after his freshman year.  Lastly, Sansing pointed to his rehabilitative potential and his family's love and support as non-statutory mitigating circumstances.

A fairminded jurist could nonetheless conclude, beyond a reasonable doubt, that "any reasonable jury would have concluded that the mitigating evidence was not sufficiently substantial to call for leniency."  *Sansing II*, 77 P.3d at 39. The Arizona Supreme Court noted that "[t]he brutality of this murder clearly sets it apart from the norm of first degree murders."  *Id.*  And the court reasonably determined that "[c]ollectively, the mitigating evidence [was] minimal at most."  *Id.*  The court carefully reviewed the record and reached a reasonable conclusion under the standard established in *Chapman* and *Neder v. United States*, 527 U.S. 1 (1999).

## C

The dissent disagrees with our decision to defer to the Arizona Supreme Court's harmless-error determination concerning the (G)(1) mitigating circumstance.  According

to the dissent, no deference is owed under AEDPA because the state court applied the wrong legal standard in making its determination. We disagree. The dissent is correct in asserting that *Neder* provides the applicable standard and that the Arizona Supreme Court was required to determine "whether a rational jury *could* have found that the facts called for leniency." *Murdaugh*, 724 F.3d at 1118 (emphasis added); *see also Neder*, 527 U.S. at 19; *United States v. Perez*, 962 F.3d 420, 442 (9th Cir. 2020). In our view, that is the standard the Arizona Supreme Court applied, even if it did not use the phrase "could have found" in explaining its conclusion.

As noted above, in *Sansing II* the court applied the harmless-error standard it had established in *Ring III*, a standard that was itself drawn from *Neder*. *See Sansing II*, 77 P.3d at 33; *Ring III*, 65 P.3d at 944 (citing *Neder*, 527 U.S. at 19). Under that standard, the Arizona Supreme Court's inquiry "focuse[d] on whether no reasonable jury *could* find that the mitigation evidence adduced during the penalty phase [was] sufficiently substantial to call for leniency." *Sansing II*, 77 P.3d at 33 (quoting *Ring III*, 65 P.3d at 944) (emphasis added). In other words, the court applied the same standard the dissent contends that *Neder* required.

It is true, as the dissent asserts, that in finding harmless error as to the (G)(1) mitigating circumstance, the Arizona Supreme Court framed its conclusion in terms of what any reasonable jury "would have" found rather than what a reasonable jury "could have" found. But nothing of substance turns on this choice of language. We know that to be true because the Supreme Court in *Neder* used the same "would have" phrase in describing the harmless-error standard adopted there. It instructed reviewing courts to ask,

"Is it clear beyond a reasonable doubt that a rational jury *would have* found the defendant guilty absent the error?" *Neder*, 527 U.S. at 18 (emphasis added). The Arizona Supreme Court asked that very question and concluded that the answer here is yes.

The dissent contends that, in answering this question, the state court ignored and discounted Sansing's evidence and generally failed to view the evidence in the light most favorable to him. We do not read the Arizona Supreme Court's decision that way. Rather, we understand the court to have concluded that Sansing's evidence, even if credited, was simply insufficient to allow a rational jury to find the existence of the (G)(1) mitigating circumstance, given his complete failure to establish a causal nexus and the uncontroverted evidence that otherwise refuted his impairment claim. The court stated that, given these evidentiary deficiencies, "[n]o reasonable jury would have concluded that Sansing met his burden to establish that his ability to control his behavior or his capacity to appreciate the wrongfulness of his conduct was significantly impaired." *Sansing II*, 77 P.3d at 37. If *no* reasonable jury would have found a given fact, then the defendant necessarily failed to present "sufficient evidence to permit a finding in his favor." Dissent at 44 (emphasis omitted). The Arizona Supreme Court thus asked the right question here; the dissent's disagreement is simply with the answer the court gave.

## III. Claim 2

We turn next to Claim 2, which alleges that Sansing's trial counsel rendered ineffective assistance in presenting his mitigation defense during the penalty phase. Sansing's two attorneys, Cotto and Ronan, divided responsibilities at the penalty phase. Cotto assumed responsibility for disputing the aggravating factors, and Ronan handled Sansing's

mitigation defense.  We therefore evaluate only Ronan's performance within the *Strickland v. Washington*, 466 U.S. 668 (1984), framework.

The PCR court held that Sansing failed to establish either deficient performance or prejudice under *Strickland*. Sansing contends that the PCR court's rejection of Claim 2 "was contrary to, or involved an unreasonable application of, clearly established Federal law," and "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  Section 2254(d) limits our review "to the record that was before the state court that adjudicated the claim on the merits."  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

We conclude that, as to most of the challenged aspects of Ronan's representation, Sansing has not demonstrated that the PCR court's resolution of *Strickland*'s deficient-performance prong was objectively unreasonable.  As to the two remaining aspects of the representation, we conclude that the PCR court reasonably determined that Sansing has not demonstrated prejudice.

A

We begin by assessing the PCR court's basis for concluding that Ronan did not render deficient performance, applying the "doubly deferential" standard of review mandated by AEDPA.  *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).

Sansing contends that several aspects of Ronan's performance fell below the Sixth Amendment standard for effective representation.  First, Sansing claims that Ronan failed to provide his experts with the materials they needed "to develop an accurate profile of [his] mental health."

*Clabourne v. Lewis*, 64 F.3d 1373, 1385 (9th Cir. 1995). Ronan could not specifically recall whether he gave the relevant files to Sansing's experts, but he testified that there was no reason why he would not have followed his standard practice of doing so. Noting that counsel is "strongly presumed to have rendered adequate assistance," *Strickland*, 466 U.S. at 690, the PCR court found no reason to doubt that Ronan did in fact provide the records to the experts.

Fairminded jurists could conclude that Sansing failed to overcome the presumption of competence accorded to Ronan's representation. *See Pinholster*, 563 U.S. at 194. The strongest contrary evidence Sansing can muster is a discrepancy in the report of Dr. Kathryn Menendez, who assessed Sansing for a learning disability. Her report states that Sansing described himself as "an average student," but the report does not mention that his grades in middle school were well below average—mostly D's and F's. From this inconsistency, one might infer that Dr. Menendez never received the school records from Ronan. But one could also infer that Dr. Menendez merely recorded Sansing's statement and failed to cross-reference her interview notes with the records Ronan had given her. The conflicting inferences that may reasonably be drawn from this evidence preclude us from saying that the PCR court's decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Second, Sansing contends that Ronan performed deficiently by failing to introduce Dr. Menendez's diagnosis that Sansing suffers from an anti-social personality disorder. The PCR court found that Ronan made a strategic decision not to present this evidence. Ronan testified at the evidentiary hearing that, "[b]ased on the report as I have now

seen it, I would not see any reason to call [Dr. Menendez]" to introduce this diagnosis.

The PCR court reasonably determined that Ronan's choice not to call Dr. Menendez as a witness fell "well within the range of professionally reasonable judgments." *Strickland*, 466 U.S. at 699; *see Crittenden v. Ayers*, 624 F.3d 943, 968 n.15 (9th Cir. 2010). Evidence of Sansing's anti-social personality disorder could have called into question the sincerity of Sansing's repeated professions of remorse, *see Beardslee v. Woodford*, 358 F.3d 560, 582 (9th Cir. 2004), even if this diagnosis can be mitigating under Arizona law, *see Lambright v. Schriro*, 490 F.3d 1103, 1125 (9th Cir. 2007). As we have observed, a "remorse-oriented strategy" can sometimes represent the defendant's best path to avoid a death sentence. *Elmore v. Sinclair*, 799 F.3d 1238, 1250 (9th Cir. 2015).

Finally, Sansing alleges that Ronan's investigation into and presentation of his family background was deficient in several respects. We disagree. For each aspect of Ronan's representation, there is a "reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

Sansing contends that Ronan failed to uphold his "obligation to conduct a thorough investigation of [Sansing's] background." *Williams v. Taylor*, 529 U.S. 362, 396 (2000). As the PCR court noted, however, Sansing's "difficult childhood was discovered, evaluated, and reported" by the defense team's mitigation specialist, Pamela Davis. Davis's investigative efforts were extensive. She frequently visited Sansing in person and regularly corresponded with him about his upbringing and drug use. She spoke with Kara and Sansing's sister Patsy in Arizona. Davis traveled to Nevada to interview Sansing's mother,

Glenda, and his sister Loretta. Davis also traveled to Utah to meet with Sansing's father, stepmother, and two half-siblings, and to collect court records related to Sansing's criminal history. And Davis traveled to Alabama to interview two more siblings, Allen and Susan, as well as Sansing's aunts and uncles.

Next, Sansing targets Ronan's failure to present expert testimony causally linking his dysfunctional upbringing to the circumstances of the murder. At the PCR evidentiary hearing, Sansing presented the testimony of a developmental psychologist, Dr. Paul Miller. Dr. Miller viewed several events in Sansing's childhood—multiple changes in residence, the constant proximity to domestic violence, his mother's divorces, and poor father figures, among others—as "risk factors" that molded Sansing's personality. He opined that these risk factors increased the probability of a "disruptive adulthood." Notably, Dr. Miller declined to offer an opinion on the "role [the risk factors] may have played in the offense" committed by Sansing.

The PCR court reasonably found that Ronan made a strategic decision not to present expert testimony linking Sansing's family background to the crime. Although a different calculus might apply if the case had been tried before a jury, Ronan believed that the sentencing judge "with his background and experience would understand the information that was going to be presented in" the Davis letter. This choice did not fall "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Much of the family-background evidence "was neither complex nor technical"; it merely required the judge to make "logical connections of the kind a layperson is well equipped to make." *Wong v. Belmontes*, 558 U.S. 15, 24 (2009) (per curiam).

Sansing also criticizes Ronan's method of presenting his traumatic childhood to the sentencing judge. Citing the 1989 American Bar Association Death Penalty Guidelines, Sansing argues that Ronan should have relied on the live testimony of his family members instead of (or in addition to) Davis's written report. But restatements of professional standards, such as the ABA guidelines, are useful "only to the extent they describe the professional norms prevailing when the representation took place." *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (per curiam). A fairminded jurist could credit Davis's testimony that the submission of a written report was the standard way to present family-background evidence to a judge in Arizona in 1999.

B

Sansing challenges two remaining aspects of Ronan's representation during the penalty phase. As to both, we will assume for the sake of argument that Ronan's performance was deficient.

The first concerns an additional alleged deficiency in the presentation of evidence related to Sansing's family background. Sansing notes that new evidence was discovered post-conviction and presented during the PCR proceedings, which he contends Ronan should have discovered and presented during the penalty phase. For instance, Sansing's siblings testified that their mother, Glenda, neglected her children, frequently beat them, and left her bedroom door open while she had sex. Glenda sometimes hit Sansing on the head with a spoon when he refused to eat his vegetables, and one stepfather would physically fight Sansing, then only 11 years old, to show him "what a real man can do." Witnesses also described numerous violent episodes between Glenda and her partners.

This new evidence "largely duplicated the mitigation evidence at trial." *Pinholster*, 563 U.S. at 200. The sentencing court was informed that Glenda's parenting skills were "ineffective," that she kept the home in an "unacceptable" condition, that Sansing was "exposed weekly to domestic abuse, fueled by his mother's and step-father's abuse of alcohol," and that "there were hundreds of calls to the police for domestic abuse" and frequent visits to the hospital for Glenda. Davis also reported to the sentencing court that Sansing was devastated by the death of his maternal grandfather and afterwards suffered from a "lack of positive male role models." The sentencing court was aware that, in the midst of an unstable childhood, Sansing began abusing drugs at a young age and completed only one year of high school. All told, Ronan convinced the sentencing court, by a preponderance of the evidence, that Sansing had a difficult childhood and a dysfunctional family. Thus, even if the new evidence had been presented during the penalty phase, it would not have altered the character of Sansing's mitigation defense in any significant respect. Sansing has failed to show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

The final aspect of Ronan's representation at issue involves his failure to investigate whether Sansing's drug use was causally linked to the murder. Ronan was aware that Sansing's intoxication would be a principal focus of the penalty phase. According to Kara, when she returned home prior to Ms. Calabrese's arrival, Sansing "was acting cold," "wasn't his normal" self, and "was in another world," a state she attributed to his consumption of crack cocaine. Yet Ronan failed to contact anyone with the requisite expertise in substance abuse. During the PCR evidentiary hearing,

Sansing presented new expert testimony that he contends Ronan should have presented during the penalty phase of the trial.

We will assume that Ronan performed deficiently by failing to present evidence of a causal link between Sansing's crack cocaine use and the murder he committed. We nonetheless reject Sansing's claim because the PCR court reasonably determined that he failed to show prejudice. The expert testimony Sansing relies on had defects that, the PCR court permissibly found, would have undercut its weight with the sentencing court.

Additional background on the expert testimony Sansing presented during the PCR evidentiary hearing is necessary before proceeding. The first expert Sansing presented was Dr. Richard Lanyon, an expert in clinical and forensic psychology. Dr. Lanyon discussed "the research showing that extreme and heavy cocaine use can cause psychosis, and that such states can last several hours." In his view, Sansing "entered some kind of severely abnormal mental state" as Ms. Calabrese turned to leave his home. But his conclusion rested entirely on how Sansing described the day's events during an interview with Dr. Lanyon years later. Sansing explained that he "became convinced" that Ms. Calabrese would report him to the police because she had witnessed him make a "surreptitious hand motion to his wife" indicating that Ms. Calabrese had not brought a purse. At this point, Sansing asserted, he "stepped into a hole [where] everything's dark," and he could not see Ms. Calabrese, only "the outline of her figure." Sansing told Dr. Lanyon that his heart was "racing and going so fast" that he thought he was going to die. After tackling her, Sansing "did the subsequent things 'out of panic.'"

Dr. Lanyon deemed Sansing's stated belief that Ms. Calabrese intended to contact the police to be a "serious and pivotal cognitive distortion [that] could have been a product of a paranoid personality disorder, or independently, a product of a delusional psychotic mental state brought about by his cocaine intoxication."    "This delusion," Dr. Lanyon concluded, "triggered a series of behaviors that were grossly out of character for him and are best explained by a psychotic mental state."

Sansing also presented the testimony of Dr. Edward French, an expert in pharmacology.    He too viewed Sansing's statements as establishing that "his chronic use of methamphetamine and crack cocaine negatively impacted the underlying cognitive and emotional dysfunctions described by Dr. Lanyon, and thereby diminished his ability to control his conduct toward the victim and his behavior several hours thereafter."   Dr. French further explained that his expert conclusion did not depend on the quantity of crack cocaine that Sansing had consumed.

In response, the State presented its own expert, Dr. Michael Bayless.   Dr. Bayless, a forensic and clinical psychologist, pointed to evidence that "Sansing admitted he knew what he was doing and that he knew it was wrong." Rather than suffering from a "paranoid delusion," Sansing took steps to avoid prosecution, albeit steps that were poorly calculated to that end.   Sansing told Dr. Bayless that "after he initially attacked the victim he was aware he had crossed the line and decided that he would attempt to make it look like a murder secondary to robbery and sexual assault." (Sansing's admission to Dr. Bayless is consistent with Kara's account of what Sansing told her just before he raped Ms. Calabrese.)    In Dr. Bayless's view, "there is no indication that [Sansing] was suffering from any psychosis."

The PCR court reasonably concluded that Sansing had not shown a reasonable probability that the testimony of Dr. Lanyon and Dr. French would have allowed him to establish the (G)(1) mitigating circumstance. Although Dr. Lanyon and Dr. French opined that Sansing suffered from cocaine-induced psychosis, they did not describe the requisite impact on Sansing's "capacity to appreciate the wrongfulness of his conduct" or to "conform his conduct to the requirements of law." Ariz. Rev. Stat. § 13-703(G)(1). Dr. Lanyon posited that Sansing was psychotic but acknowledged that Sansing knew "he crossed the line," feared being arrested, and acted to avoid being caught. And Dr. French defined psychosis broadly as a "thought disorder" that prevents an individual from "cop[ing] well with emotional things that are occurring in [his] environment." This type of expert opinion falls short of proving substantial impairment under Arizona law, particularly given the evidence establishing Sansing's attempts to avoid prosecution. *See Medrano*, 914 P.2d at 228; *Kiles*, 857 P.2d at 1228–29.

Moreover, Dr. Lanyon and Dr. French did not base their conclusions on the amount of cocaine Sansing ingested. Instead, they drew speculative inferences from Sansing's descriptions of how he felt during the attack. The PCR court reasonably concluded that the sentencing court would have discounted expert testimony "marred by Sansing's motive to fabricate." *See State v. Poyson*, 7 P.3d 79, 89 (Ariz. 2000); *Medrano*, 914 P.2d at 227.

Nor would the new expert testimony have significantly altered the character of the non-statutory mitigating circumstances before the sentencing court. The court already knew that Sansing was under the influence of crack cocaine at the time of the crime. Because Ronan had

introduced enough evidence to establish Sansing's impairment as a non-statutory mitigating circumstance, the opinions of Dr. Lanyon and Dr. French would have been cumulative on that issue. *See Smith v. Ryan*, 823 F.3d 1270, 1296 (9th Cir. 2016). Thus, the PCR court reasonably concluded that the likelihood of a different sentencing outcome was merely "conceivable," not reasonably probable. *Richter*, 562 U.S. at 112.[2]

Finally, Sansing contends that, even if he has not shown a reasonable probability of a different outcome during the penalty phase of the trial, we should consider the impact Ronan's deficient performance had on the outcome of his direct appeal. Specifically, Sansing argues that, had Ronan presented expert testimony on crack cocaine abuse, there is a reasonable probability that the Arizona Supreme Court would not have found the *Ring* error harmless beyond a reasonable doubt in *Sansing II*.

We cannot accept Sansing's invitation to consider whether the testimony of Dr. French and Dr. Lanyon would have affected the outcome of his direct appeal. The PCR court did not fail to apply "clearly established Federal law, as determined by the Supreme Court," when it assessed only

---

[2] Although it does not impact our prejudice analysis, we note one credibility concern with the testimony of Dr. Bayless. Based primarily on a hand gesture Sansing allegedly made during their interview together, Dr. Bayless inferred an explanation for Sansing's decision to rape Ms. Calabrese—namely, that "her dress flew up," thereby exposing her vaginal area. The PCR court found Dr. Bayless's testimony credible, notwithstanding the fact that Ms. Calabrese was wearing pants during the attack. Despite the baseless nature of Dr. Bayless's testimony on this point, we do not think it affected the outcome here, as the reason Sansing committed the rape was immaterial both to the sentencing court's decision and to the PCR court's prejudice analysis.

the probability of a different outcome at the penalty phase of the trial. 28 U.S.C. § 2254(d)(1). The Supreme Court has not yet held that courts must evaluate the impact of trial counsel's deficient performance on the outcome of a petitioner's direct appeal. *Cf. Weaver v. Massachusetts*, 137 S. Ct. 1899, 1910–11 (2017) (requiring petitioner to show a reasonable probability of a different outcome *at trial*, even though trial counsel's deficient performance consisted of failing to object to structural error that would have entitled petitioner to automatic reversal on direct appeal). Thus, under AEDPA, we cannot fault the PCR court for viewing the scope of *Strickland*'s prejudice analysis as extending no further than the trial itself.

## IV.  Claims 4 and 8

Sansing raises two closely related claims, Claims 4 and 8, stemming from the factual basis he offered when pleading guilty and a related sentencing stipulation. In Claim 8, which we address first, Sansing contends that he did not knowingly and intelligently waive his privilege against self-incrimination when admitting a particular fact during the plea colloquy. In Claim 4, he alleges that Ronan rendered ineffective assistance during the guilty-plea process in violation of his right to counsel under the Sixth Amendment.

## A

Sansing frames Claim 8 as a due process challenge to the factual basis he provided during the plea colloquy. When he entered his guilty pleas, Sansing signed a written factual basis and orally attested to its truth at the change-of-plea hearing. That factual basis included an admission that "the victim was still conscious, alive and tied up with cords" when Sansing returned to the house after moving Ms. Calabrese's truck (and thus was likely conscious when

he raped her). Sansing alleges that he was unaware that his admission that Ms. Calabrese was conscious during the rape could be used to prove cruelty under the (F)(6) aggravating factor. For this reason, Sansing argues, the waiver of his privilege against self-incrimination was not knowing and intelligent. Because the PCR court summarily denied this claim, we can grant relief only if no reasonable application of the Supreme Court's precedent as of 2008 "could have supported" the result. *Richter*, 562 U.S. at 102.

Sansing relies on the Supreme Court's decision in *Boykin v. Alabama*, 395 U.S. 238 (1969), but that case did not require the trial court to inform Sansing during the plea colloquy that the State could rely on the factual basis during the penalty phase. To ensure that a guilty plea is "intelligent and voluntary," the trial court must advise the defendant of three constitutional rights he waives by pleading guilty: his privilege against compulsory self-incrimination, his right to a jury trial, and his right to confront witnesses against him. *Id.* at 242–44. The trial court provided those advisements to Sansing during his change-of-plea hearing. The Supreme Court has not yet held that the trial court must affirmatively discuss during the plea colloquy the potential impact a defendant's factual admissions may have on capital sentencing proceedings. Section 2254(d)(1) "does not require state courts to *extend* [the Supreme Court's] precedent or license federal courts to treat the failure to do so as error." *White v. Woodall*, 572 U.S. 415, 426 (2014).

B

In Claim 4, Sansing asserts an ineffective-assistance-of-counsel claim that shares the same factual predicate as Claim 8. We issued a certificate of appealability for this claim under 28 U.S.C. § 2253(c). *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Claim 4 centers on the same admission that Ms. Calabrese was conscious during the rape, but it encompasses a related sentencing stipulation as well. During the penalty phase, Sansing stipulated to the admission of hearsay statements made by his children so that the State would not call them as witnesses. The children reported that Sansing planned to rob whomever delivered the box of food, and they described how the attack unfolded. In addition, Sansing stipulated that Victoria Harker, a journalist, would have testified that Sansing told her while awaiting trial that "after raping and beating [Ms. Calabrese] so badly, he decided to kill her to end her suffering," and that when he returned from moving her truck, Ms. Calabrese "had regained consciousness."

Sansing contends that Ronan rendered ineffective assistance because (1) he did not inform Sansing that the State could use the factual basis during the penalty phase of his trial; (2) he permitted Sansing to admit that Ms. Calabrese was conscious during the rape even though that was not an element of any of the charged offenses; and (3) he stipulated to the admission of out-of-court statements by Sansing's children and Harker without first interviewing them.

Because the PCR court denied this claim without reasoning, we are again precluded from granting relief unless no reasonable application of Supreme Court precedent "could have supported" the result. *Richter*, 562 U.S. at 102. Here, we need discuss only the prejudice prong of *Strickland*. Sansing alleges that, absent Ronan's deficient performance, he would not have admitted Ms. Calabrese was conscious and would not have agreed to the sentencing stipulation. To establish prejudice under *Strickland*, he must show a reasonable probability that he

would have received a different sentence had the admission and sentencing stipulation not been offered. *See Strickland*, 466 U.S. at 694.

Even accepting that Ronan rendered ineffective assistance in the three respects described above, a fairminded jurist could conclude that Sansing failed to show a reasonable probability he would have received a different sentence. Sansing's claim of prejudice is refuted by the State's ability to call witnesses who would have established the same facts covered by the factual basis and sentencing stipulation. The admission of Ms. Calabrese's consciousness in the factual basis did not change the mix of evidence before the sentencing court because Sansing had already told Harker that "the victim had regained consciousness" when he returned from moving Ms. Calabrese's truck, and that he killed her to "end her suffering." Nor was Ronan's use of a sentencing stipulation prejudicial, given that Sansing presented no evidence that his children or Harker would have testified differently if Ronan had refused to stipulate to the admission of their out-of-court statements. In other words, the State could have called Harker to repeat Sansing's admission that Ms. Calabrese was conscious, *see* Ariz. R. Evid. 801(d)(2)(A), and the State could have replaced the sentencing stipulation with in-court testimony by Sansing's children. Their statements, moreover, largely tracked the narrative that Kara provided when she testified during the penalty phase.

## V.  Claim 7

In Claim 7, Sansing alleges that the Arizona courts violated the Eighth Amendment by applying an impermissible "causal nexus" test when assessing his non-statutory mitigating circumstances. *See Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982).

Beginning in 1989, and continuing through the time of Sansing's trial in 1999, Arizona courts frequently applied "a 'causal nexus' test for nonstatutory mitigation that forbade as a matter of law giving weight to mitigating evidence, such as family background or mental condition, unless the background or mental condition was causally connected to the crime." *McKinney v. Ryan*, 813 F.3d 798, 802 (9th Cir. 2015) (en banc). In 2004, the Supreme Court "unequivocally rejected" causal-nexus tests like Arizona's. *Smith v. Texas*, 543 U.S. 37, 45 (2004) (per curiam); *see Tennard v. Dretke*, 542 U.S. 274, 285 (2004). We later held that *Tennard* and *Smith* apply retroactively on federal habeas review. *Schad v. Ryan*, 671 F.3d 708, 723 (9th Cir. 2011) (per curiam).

Sansing contends that the sentencing court and the Arizona Supreme Court both applied the causal-nexus test we condemned in *McKinney*. We address each court's actions in turn.

The sentencing court did not treat "would-be mitigation evidence as legally irrelevant in violation of *Eddings*." *McKinney*, 813 F.3d at 818. Although the court evaluated Sansing's evidence of intoxication for a causal link to the crime, "[w]hen applied solely in the context of statutory mitigation under § 13-703(G)(1), the causal nexus test does not violate *Eddings*." *Id.* at 810. The court still considered Sansing's impairment to be a non-statutory mitigating circumstance, which shows that it "did not exclude evidence from [its] mitigation assessment based solely on the lack of a causal nexus." *Mann v. Ryan*, 828 F.3d 1143, 1159 (9th Cir. 2016) (en banc).

The sentencing court also reduced the weight accorded certain mitigating circumstances due to the absence of a causal nexus, a choice not foreclosed by *Eddings*. *See*

*Poyson v. Ryan*, 879 F.3d 875, 888 (9th Cir. 2018). After finding that Sansing "has shown by a preponderance of the evidence that he had a difficult childhood and family background," the court noted that there was no "causal link to the horrific crime." On that basis, the court did "not give significant mitigating weight" to this factor. Similarly, the court gave "only minimal weight" to the evidence of love and support from Sansing's family "because it did not prevent the defendant from committing this horrible crime." The sentencing court's reference to the weight of these factors bolsters our conclusion that it did not strip the mitigating circumstances of all weight by applying an unconstitutional causal-nexus test.[3]

Sansing argues that the Arizona Supreme Court also applied an impermissible causal-nexus test when adjudicating his claim in *Sansing I* that the sentencing court violated the Eighth Amendment. He highlights the Arizona Supreme Court's assertion that "'Arizona law states that a difficult family background is *not relevant* unless the defendant can establish that his family experience *is linked to his criminal behavior*.'" *Sansing I*, 26 P.3d at 1129–30 (emphasis added) (quoting *State v. Djerf*, 959 P.2d 1274,

---

[3] For the same reason, we reject Sansing's argument that the Arizona Supreme Court improperly employed a causal-nexus test in *Sansing II* when it held that a rational jury would have given "only minimal weight" to Sansing's difficult childhood and lack of education absent a "causal link" to the crime. 77 P.3d at 39. As discussed, the lack of a causal nexus may appropriately bear on the weight to be given mitigating evidence, and a jury is "free to assign less weight to mitigating factors that did not influence a defendant's conduct at the time of the crime." *Hedlund v. Ryan*, 854 F.3d 557, 587 n.23 (9th Cir. 2017). Thus, the Arizona Supreme Court permissibly "raised the issue of a causal nexus to determine the weight that a hypothetical jury would have given relevant mitigating evidence." *Murdaugh*, 724 F.3d at 1122 (internal quotation marks omitted).

1289 (Ariz. 1998)).  And he points to the court's reliance on *Djerf* and *State v. Hoskins*, 14 P.3d 997 (Ariz. 2000), two cases we have identified as examples of Arizona's unconstitutional causal-nexus test.  *See McKinney*, 813 F.3d at 814–15.

These factors raise the possibility that the Arizona Supreme Court applied a rule contrary to *Eddings*.  We need not resolve that issue, however, because even if the Arizona Supreme Court erred in this regard, Sansing cannot show actual prejudice from the error under *Brecht*.  *See Djerf v. Ryan*, 931 F.3d 870, 885–87 (9th Cir. 2019); *Greenway v. Ryan*, 866 F.3d 1094, 1100 (9th Cir. 2017) (per curiam).  We see nothing in the record remotely suggesting that the Arizona Supreme Court would have reached a different conclusion had it followed the sentencing court's lead and accorded Sansing's difficult family background minimal weight rather than no weight.

## VI.  Claim 12

In Claim 12, Sansing alleges that the sentencing court violated his Eighth Amendment rights by refusing to consider a letter submitted by Ms. Calabrese's 10-year-old daughter.  In the letter, handwritten and addressed to the sentencing judge, Ms. Calabrese's daughter expressed her view that Sansing "should go to jail instead of dying."  The Arizona Supreme Court upheld the sentencing court's refusal to consider the letter on the ground that it was "irrelevant to either the defendant's character or the circumstances of the crime."  *Sansing I*, 26 P.3d at 1129. The court also noted that state law forbade "the consideration of 'any recommendation made by the victim regarding the sentence to be imposed.'"  *Id.* (quoting Ariz. Rev. Stat. § 13-703(D) (2001)).

Sansing contends that the Arizona Supreme Court's decision involved an unreasonable application of the Supreme Court's Eighth Amendment precedent, but relief on this claim is precluded under 28 U.S.C. § 2254(d)(1). The Supreme Court has held that the Eighth Amendment prohibits the State from introducing the victim's family's recommendation that the defendant be put to death. *Booth v. Maryland*, 482 U.S. 496, 502–03 (1987); *see Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016) (per curiam) (noting that *Booth* remains good law on this point). But the Court has never held that a defendant in a capital case is entitled to have the jury consider the victim's family's recommendation of leniency. Indeed, to our knowledge, no court has adopted that interpretation of the Eighth Amendment, and at least two circuits and a number of state high courts have rejected it. *See United States v. Brown*, 441 F.3d 1330, 1351–52 n.8 (11th Cir. 2006); *Robison v. Maynard*, 829 F.2d 1501, 1504–05 (10th Cir. 1987); *see also Kaczmarek v. State*, 91 P.3d 16, 32 n.71 (Nev. 2004) (collecting cases). These "diverging approaches to the question illustrate the possibility of fairminded disagreement." *Woodall*, 572 U.S. at 422 n.3.

*         *         *

Because Sansing is not entitled to relief on any of the claims certified for our review, we affirm the district court's denial of his petition for a writ of habeas corpus.

**AFFIRMED.**

BERZON, Circuit Judge, dissenting:

I respectfully dissent. I would grant the petition as to Claim 1, *Ring* error prejudice, and so would not reach the other challenges to the death sentence discussed in the majority opinion. I concur in the majority's analysis of Claims 4 and 8, relating to the factual basis Sansing offered when pleading guilty.

The Arizona courts denied John Sansing's constitutional right to have the facts making him eligible for a death sentence determined by a jury, not a judge. *Ring v. Arizona*, 536 U.S. 584, 589 (2002). The Arizona Supreme Court then concluded that that constitutional error was harmless beyond a reasonable doubt because, in its view, any reasonable juror would have found that Sansing murdered Trudy Calabrese in an especially cruel and heinous way, and no reasonable jury "would have found" that the mitigating evidence was sufficiently substantial to call for leniency. *State v. Sansing (Sansing II)*, 77 P.3d 30, 35–36, 39 (Ariz. 2003). In so holding, the Arizona Supreme Court applied the wrong legal standard, contrary to clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

*Neder v. United States*, 527 U.S. 1 (1999), instructs that the failure to have a jury determine a required element in a criminal case is not harmless if the defendant presented *sufficient* evidence to permit a finding in his favor. *Id.* at 19. The question is not what a court believes a reasonable jury *would* have found, but what a reasonable jury *could* have found, given the evidence in the record. *See id.* Critically, in reviewing whether Sansing presented sufficient evidence to support a finding that mitigating factors existed, the Arizona Supreme Court was required, but failed, to view the evidence in the light most favorable to Sansing. *Cf. Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (explaining how to

conduct a sufficiency-of-evidence review in the context of determining whether the evidence was sufficient to convict). The state court weighed and discounted witness testimony, but those determinations are improper in a sufficiency-of-evidence review, as it is the jury's role to assess the weight and credibility of testimony. *See Schlup v. Delo*, 513 U.S. 298, 330 (1995) (citing *Jackson*, 443 U.S. at 319).

Because the Arizona Supreme Court applied the wrong legal standard, we owe no deference to its harmlessness determination. *See Inthavong v. Lamarque*, 420 F.3d 1055, 1059 (9th Cir. 2005). I would therefore go on to review, under *Brecht v. Abrahamson*, 507 U.S. 619 (1993), whether the deprivation of the right to a jury determination had a "substantial and injurious effect" on Sansing's sentence. *Id.* at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). Under our precedent, we conduct that inquiry by asking the same question the Arizona Supreme Court should have asked: "whether a rational jury *could* have found" that Sansing had established the existence of mitigating factors. *Murdaugh v. Ryan*, 724 F.3d 1104, 1118 (9th Cir. 2013) (emphasis added).

If the evidence is viewed in the light most favorable to Sansing, as is proper under *Neder* and *Murdaugh*, then Sansing assuredly presented sufficient evidence to allow a jury to conclude that, because of his crack cocaine use, his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was "significantly impaired." Ariz. Rev. Stat. § 13-703(G)(1) (1999). In the present context—that is, where there was no jury determination at all, so the question is not the likely impact of a constitutional error in the jury trial—the possibility that a jury could have so found is enough to establish prejudice under *Brecht*. *Murdaugh*, 724 F.3d

at 1120. Had a jury so found, the aggravating and mitigating factors in Sansing's case could reasonably have been weighed differently, and he could not have been sentenced to death. I would therefore grant Sansing's petition for a writ of habeas corpus as to Claim 1.

## I.

As recounted by the majority, *Ring* ruled unconstitutional the judge-based capital-sentencing scheme in effect in Arizona at the time of Sansing's sentencing. *Ring*, 536 U.S. at 609; Majority op. 12. *Ring* relied on *Apprendi v. New Jersey*, 530 U.S. 466 (2000), which held that "the Sixth Amendment does not permit a defendant to be 'exposed . . . to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone.'" *Ring*, 536 U.S. at 588–89 (quoting *Apprendi*, 530 U.S. at 483) (alteration omitted). The Court concluded in *Ring* that "[c]apital defendants, no less than noncapital defendants, . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Id.* at 589.

The Arizona capital sentencing statute provided that, in "determining whether to impose a sentence of death or life imprisonment," the sentencing judge "shall take into account the aggravating and mitigating circumstances included in . . . this section and shall impose a sentence of death if the court finds one or more of the [enumerated] aggravating circumstances . . . and that there are no mitigating circumstances sufficiently substantial to call for leniency." Ariz. Rev. Stat. § 13-703(E) (1999). We have interpreted *Ring* to require that a jury determine not only the "presence or absence of the aggravating factors required by Arizona law for imposition of the death penalty," *Ring*, 536 U.S. at 588, but also "the existence or absence of mitigating

circumstances," *Murdaugh*, 724 F.3d at 1117. *Murdaugh* concluded that *Ring* requires this dual finding because under the Arizona scheme, "a defendant's eligibility for a death sentence was effectively contingent on the judge's findings regarding *both* aggravating and mitigating circumstances," as the "'ultimate element' qualifying the defendant for death was 'at least one aggravating circumstance not outweighed by one or more mitigating factors.'" *Id.* at 1115 (quoting *State v. Ring*, 65 P.3d 915, 935 (Ariz. 2003)).

Notably, *Murdaugh* did *not* hold that the weighing of aggravating against mitigating factors is a factual determination that must under *Ring* be carried out by a jury. Recently, the Supreme Court held that "a jury (as opposed to a judge) is not constitutionally required to *weigh* the aggravating and mitigating circumstances or to make the ultimate sentencing decision within the relevant sentencing range." *McKinney v. Arizona*, 140 S. Ct. 702, 707 (2020) (emphasis added). *McKinney* does not affect *Murdaugh*'s conclusion that a jury must find "the *existence or absence* of mitigating circumstances." *Murdaugh*, 724 F.3d at 1117 (emphasis added). We therefore remain bound by our precedent to consider whether the Arizona courts' deprivation of Sansing's right to have a jury determine the presence or absence of mitigating factors was harmless.[1]

---

[1] In my view, the right to have a jury find the facts required to impose the death penalty is fundamental, and the deprivation of that right can never be harmless. *See Sullivan v. Louisiana*, 508 U.S. 275, 281–82 (1993) (deprivation of the right to trial by jury "unquestionably qualifies as structural error" (internal quotation marks omitted)); *Summerlin v. Stewart*, 341 F.3d 1082, 1116 (9th Cir. 2003) (en banc), *rev'd on other grounds*, *Schriro v. Summerlin*, 542 U.S. 348 (2004); *Sansing II*, 77 P.3d at 40 (Jones, C.J., concurring in part and dissenting in part); *State v. Ring*, 65 P.3d 915, 946–48 (Ariz. 2003) (Feldman, J., concurring in part and

## II.

The majority determines that the Arizona Supreme Court's application of the "harmless beyond a reasonable doubt" standard from *Chapman v. California*, 386 U.S. 18, 24 (1967), was not objectively unreasonable under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254(d)(1). Majority op. 17. The majority concludes that habeas relief is therefore not warranted, and finds no need to apply the "substantial and injurious effect" standard from *Brecht*, 507 U.S. at 637.

I note that the majority's approach of applying the AEDPA/*Chapman* test in lieu of *Brecht* is permissible under our case law, *see Sifuentes v. Brazelton*, 825 F.3d 506, 536 (9th Cir. 2016), but to the extent the majority suggests that it *must* apply AEDPA/*Chapman*, Majority op. 16–17, that suggestion is erroneous, *see Deck v. Jenkins*, 814 F.3d 954, 985 (9th Cir. 2016)*.* A court *denying* habeas relief may apply either AEDPA/*Chapman* or *Brecht*, as *Brecht*'s more stringent standard subsumes the AEDPA standard. *Id.*[2]

---

dissenting in part). Moreover, determining what a nonexistent jury would have done regarding a penalty phase record that would undoubtedly have been quite different if tried to a jury rather than a judge is an exercise in rank speculation that should not govern life-or-death determinations. But because the Supreme Court has specifically left open whether *Ring* error can be harmless, *see Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (citing *Ring*, 536 U.S. at 609 n.7), we have held that we must defer to the Arizona Supreme Court's decision to apply harmless error review, *see Murdaugh*, 724 F.3d at 1117. This opinion follows that course.

[2] The Supreme Court recently granted certiorari on the question whether "a federal habeas court [may] grant relief based *solely* on its conclusion that the *Brecht* test is satisfied" or whether it "must . . . also find that the state court's *Chapman* application was unreasonable under

A court *granting* habeas relief must apply *Brecht*, however. *See Fry v. Pliler*, 551 U.S. 112, 119–20 (2007); *Sifuentes*, 825 F.3d at 534–35 & n.6; *Inthavong*, 420 F.3d at 1059.[3] Because the majority applied AEDPA/*Chapman* and because Supreme Court case law still requires *Brecht* to be met before habeas relief can be granted, I apply both tests here.

## A.

The majority errs in its review of the state court's application of *Chapman*. The state court's application was contrary to federal law, as clearly established by *Neder v. United States*, 527 U.S. 1 (1999). *Neder* set forth narrow parameters for applying *Chapman* in cases in which an essential element of a criminal offense was never submitted to a jury at all. *Id.* at 19.

In *Neder*, the defendant was convicted of federal charges involving tax fraud. Although materiality was an element of the crime, the district court refused to submit the materiality

---

[28 U.S.C.] § 2254(d)(1)." *Brown v. Davenport*, No. 20-826 (U.S. cert. granted Apr. 5, 2021).

[3] In my view, the Supreme Court has not adequately explained why *Brecht* still applies *after* an AEDPA analysis results in the conclusion that the state court's harmlessness analysis is not entitled to AEDPA deference. *Fry* observed only that it was "implausible" that Congress intended for AEDPA to replace the *Brecht* standard and that "it certainly [made] no sense to require formal application of both tests." 551 U.S. at 119–20 (emphasis omitted). Writing on a blank slate, I would hold that it is anomalous to allow one test, AEDPA/*Chapman*, to suffice if a court is ruling that any error is harmless—as the majority does here—but to require a second analysis, *Brecht*, if it first rules, applying AEDPA, against the state court's harmlessness conclusion, even if on full *de novo* review the result would be otherwise.

issue to the jury. *Id.* at 4. *Neder* applied harmless error review under *Chapman*, but it explained that because the omitted element was never submitted to a jury, the review must focus on "whether the record contains evidence that *could* rationally lead to a contrary finding with respect to the omitted element." *Id.* at 19 (emphasis added). If, after a "thorough examination of the record," the reviewing court "cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, where the defendant *contested* the omitted element and raised evidence *sufficient* to support a contrary finding— it should not find the error harmless." *Id.* (emphasis added).

The reason for conducting a sufficiency-of-evidence review in these circumstances instead of the typical record-as-a-whole *Chapman* inquiry is that the whole-record approach to *Chapman* cannot be applied directly where, as here, there was not simply a trial error during a jury trial but no jury at all. "[T]he question [*Chapman*] instructs the reviewing court to consider is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it *had* upon the [jury determination] in the case at hand." *Sullivan v. Louisiana*, 508 U.S. 275, 279 (1993) (emphasis added). Where the constitutional error is that there was no jury at all, a *Chapman* analysis cannot be directed at answering that question, but must instead take into account the difficulty of projecting what a jury would have done on an issue never presented to it. *See id.* at 280.

That is why, as we have recently observed, *Neder* sets "a high bar for finding harmlessness beyond a reasonable doubt" with regard to an issue never decided at all by a jury. *United States v. Perez*, 962 F.3d 420, 442 (9th Cir. 2020). In that circumstance, the question is not whether there is,

beyond a reasonable doubt, strong evidence to support the trial judge's finding on the element in question, but whether there is sufficient evidence to support the *defendant's* contentions to the contrary. *Id.* Where there is, an appellate court cannot with any confidence predict beyond a reasonable doubt that a non-existent jury would have rejected the sufficient evidence in favor of the prosecution's case.

Importantly, a court reviewing that sufficiency-of-evidence question asks whether the record contains evidence that "could" lead to a particular finding. *Neder*, 527 U.S. at 19; *see Jackson*, 443 U.S. at 319. "[T]he use of the word 'could' focuses the inquiry on the power of the trier of fact to reach its conclusion," and not on the reviewing court's assessment of how a factfinder would "likely behav[e]" on the record as a whole. *Schlup*, 513 U.S. at 330 (quoting *Jackson*, 443 U.S. at 319). For that reason, a court applying *Neder*'s harmless error standard must view all the evidence in the "light most favorable" to the defense assertion that there was sufficient evidence to support a finding in its favor, *see Jackson*, 443 U.S. at 319, and generally does not assess the "credibility of witnesses," *see Schlup*, 513 U.S. at 330.

A useful analogy is the context of determining whether a criminal defendant has a right to a jury instruction on a defense. In that instance, as here, the defendant is deprived of a jury determination that should have gone forward. In the precluded defense context, we ask only whether the defendant has presented sufficient evidence to warrant the requested instruction, recognizing that the "weight and credibility of the conflicting testimony are issues [for] the jury, not the court," to resolve. *United States v. Becerra*, 992 F.2d 960, 963–64 (9th Cir. 1993), *overruled on other grounds by United States v. Collazo*, 984 F.3d 1308, 1335

(9th Cir. 2021); *see also United States v. Bailey*, 444 U.S. 394, 414–15 (1980). Likewise, in assessing sufficiency in the civil summary judgment context, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## B.

Here, the sentencing judge found it "likely" that Sansing "was impaired or affected by his crack cocaine usage at the time of the murder" but held that Sansing had not shown he was sufficiently impaired to establish the (G)(1) mitigating factor. To meet that factor, Sansing was required to prove by a preponderance of the evidence that his "capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was *significantly* impaired, *but not so impaired as to constitute a defense to prosecution*." Ariz. Rev. Stat. § 13-703(G)(1) (1999) (emphasis added); *Sansing II*, 77 P.3d at 36. In other words, Sansing had to show that his "mental capabilities were significantly, but only partially, impaired." *State v. Gretzler*, 659 P.2d 1, 17 (Ariz. 1983) (upholding finding of impairment where "continuous use of drugs likely impaired defendant's volitional capabilities" although he retained the ability to "distinguish right from wrong" and to "exercise some control over his behavior," *id.* at 16–17). In reviewing whether Sansing was prejudiced by the deprivation of his right to have a jury decide whether he had established the (G)(1) mitigating factor, the Arizona Supreme Court, contrary to *Neder*, failed to consider whether, *viewing the evidence in the light most favorable to Sansing*, the record contained *sufficient* evidence to allow a jury to find that Sansing's capacity to appreciate the wrongfulness of his

conduct or to conform his conduct to the requirements of law was significantly impaired. *See Sansing II*, 77 P.3d at 37–38; Ariz. Rev. Stat. § 13-703(G)(1) (1999).

1.   The Arizona Supreme Court began by reasoning that Sansing had "failed entirely to show any causal nexus between his alleged drug use and impairment" because he "presented no expert testimony to support his assertion that his use of cocaine impaired either his capacity to control his conduct or his capacity to appreciate the wrongfulness of his actions." *Sansing II*, 77 P.3d at 37. But Sansing's failure to present expert testimony would not *preclude* a jury from finding significant impairment. The Arizona Supreme Court has not held expert testimony required to satisfy the (G)(1) mitigating factor, only that it is "[t]ypically" presented. *Id.* As discussed below, Sansing presented other evidence of his drug use and its effect on him at the time of the murder, which a jury could have credited.

The state court's critique of Sansing's failure to present expert testimony is particularly problematic given the nature of *Ring* error. At sentencing, Sansing's counsel presented a case for mitigation to a judge, not a jury. Had there been a jury, counsel unquestionably would have presented the case differently. In a hearing on Sansing's petition for postconviction review, his trial counsel stated that, although he did not remember the details of his decision-making process, he likely had not presented expert testimony regarding Sansing's drug use because he "felt that Judge Reinstein . . . with his background and experience . . . understood the nexus between substance abuse and the commission of crimes." In the analogous context of applying *Neder* to determine whether an *Apprendi* error was harmless, we emphasized, in a case in which the defendant was convicted after a guilty plea, that the "record is . . . a guide

to determining what the evidence would have established if the case had proceeded to trial," but is "not a substitute for a trial, and there need only be evidence sufficient to support a contrary finding to show that the error was not harmless." *United States v. Hunt*, 656 F.3d 906, 913 (9th Cir. 2011).

Here, the bench trial was no substitute for a jury trial. The Arizona Supreme Court's conclusion that the deprivation of Sansing's right to present his mitigation case to a jury was harmless because defense counsel failed, in a hearing before a sophisticated judge, to present expert testimony that he may well have chosen to present to a jury of laypersons does not take account of the different strategies that are effective at jury and at judge trials, especially where the death penalty is at stake. *Cf. Gallegos v. Ryan*, 820 F.3d 1013, 1039 (9th Cir.), *opinion amended on reh'g*, 842 F.3d 1123 (9th Cir. 2016) (explaining that there is "really no way to know" how a jury would have weighed mitigating evidence rejected by the sentencing judge); *Gallegos v. Shinn*, No. CV-01-01909-PHX-NVW, 2020 WL 7230698, at *28 (D. Ariz. Dec. 8, 2020) (quoting *Gallegos v. Ryan*, 820 F.3d at 1039).

2.  At the penalty phase, Sansing did present evidence of his drug use and its impact, albeit without expert testimony. He did so through a letter from a mitigation specialist, Pamela Davis, and the testimony of his wife, Kara Sansing, and his sister, Patsy Hooper. In its harmlessness analysis, the Arizona Supreme Court entirely ignored the evidence from Davis and Hooper.

Davis reported, based on interviews with Sansing and his family members, that Sansing began using marijuana in fifth grade and struggled with drug addiction throughout his adult life. At the time of Ms. Calabrese's murder, Sansing and Kara "had been on a four day binge of crack cocaine use,"

during which time they had spent $750 on crack cocaine. Davis also quoted an article stating that heavy cocaine use can produce paranoia and aggression. Under *Neder*, the Arizona Supreme Court should have included this record evidence in its *Chapman*/sufficiency-of-evidence review. *See* 527 U.S. at 19.

Although the Arizona Supreme Court discussed Kara's testimony about Sansing's drug use on the day of the murder, the court weighed and discounted her testimony, contrary to *Neder*. *Sansing II*, 77 P.3d at 37–38. In the hours before the murder, Sansing smoked crack cocaine at least twice—first by himself, while Kara was at work, and later with Kara, about 40 minutes before Ms. Calabrese arrived at the Sansing home. *State v. Sansing* (*Sansing I*), 26 P.3d 1118, 1123 (2001). Kara testified that when she spoke with Sansing over the phone before coming home from work, he sounded "hyped up" and "[a]nxious." When she got home, she could "tell he was nervous" and that he had been using cocaine. He was "pacing" and acting "cold." He did not give her a kiss or a hug as he normally did.

Kara testified that Sansing's demeanor while he was assaulting Ms. Calabrese was different from anything she had witnessed in him before. She said: "He was acting cold. It wasn't my husband. It wasn't his normal. Even though he has smoked crack before, he wouldn't act the way he did that day." Kara elaborated that Sansing was acting like "he wasn't there. It's like he was in another world. . . . It wasn't my husband."

The Arizona Supreme Court determined that Kara's testimony was "insufficient to establish, by a preponderance of the evidence, that Sansing's capacity to control his behavior was significantly impaired." *Sansing II*, 77 P.3d at 37. In so holding, the court reasoned, first, that "Kara did not

quantify how much crack Sansing used." *Id.* But Sansing did present evidence relating to the quantity of crack cocaine he used: the evidence from Davis that Sansing and Kara had spent $750 on crack cocaine in the four days leading up to the murder. Again, the Arizona Supreme Court improperly ignored that evidence.

Second, the court held that "no reasonable jury *would* conclude that Kara's testimony that Sansing was not acting himself was sufficient to establish that his capacity was significantly impaired." *Id.* (emphasis added). The court quoted a sentence from *State v. Jordan*, 614 P.2d 825, 832 (Ariz. 1980), rejecting testimony that was "inexact as to defendant's level of intoxication at the time of the crime" and lacked a "description of how defendant's intoxication affected his conduct." *Sansing II*, 77 P.3d at 37–38. Again, the question the Arizona Supreme Court was required to ask was not whether, in its view, a jury *would* conclude that Sansing's capacity was significantly impaired, but whether a jury *could* so conclude. In weighing and discounting Kara's testimony, the court usurped the role of the absent jury, whose province it was to make credibility and evidence-weighing determinations. *See Anderson*, 477 U.S. at 255.

Hooper testified that Sansing drove to her house the day after the murder and confessed to her. Hooper called their father, who called the police. Sansing waited with Hooper for the police to arrive and surrendered quietly. Hooper testified that Sansing looked like he "hadn't slept for days" and that he "had dark circles under his eyes." Hooper believed that Sansing had been "taken by the drugs he had been doing," and that the drugs contributed "a lot" to his murder of Ms. Calabrese. Again, the Arizona Supreme Court

should have considered this record evidence as part of its sufficiency-of-evidence review. *See Neder*, 527 U.S. at 19.

3. In addition to improperly ignoring and discounting the evidence of drug use that Sansing presented, the Arizona Supreme Court concluded that Sansing's "deliberate actions" and "steps . . . to avoid detection" "refute[d]" and "negate[d]" his impairment claim. *Sansing II*, 77 P.3d at 38. In so holding, the state court put emphasis on the weight of the prosecution's evidence, and so failed to view the evidence in the light most favorable to Sansing, contrary to *Neder*.

The evidence that Sansing planned to rob the person who delivered food did not *preclude* a rational jury from finding significant impairment, even if it could support the opposite conclusion. Viewed in the light most favorable to Sansing, that evidence showed that Sansing planned to commit a robbery, not a murder. Sansing arranged for the food delivery while Kara was at work, and when she returned home, he smoked more crack cocaine and told Kara about his plan to rob the delivery person. *Sansing I*, 26 P.3d at 1123. A rational jury could have concluded that Sansing's impairment increased *after* he made the robbery plan, and that his impairment played a significant role in the extreme escalation of events from a planned robbery to a murder.

Finally, the actions Sansing took to avoid detection did not preclude a finding of significant impairment. Viewed in the light most favorable to Sansing, those actions were minor and would have been obviously ineffective to a normally functioning person. Sansing moved Ms. Calabrese's truck, but only a short distance from his house. *Id.* at 1123. He "hid" her body by placing it under some debris in his own backyard, where it was visible from the alley. *Id.*

In *Murdaugh*, we addressed a defendant's similarly ineffectual attempts to avoid detection—first sprinkling horse manure over the victim's body, before dismembering it many hours later. We concluded that "a reasonable jury might not have found that [defendant's] actions to cover up the murder demonstrated any kind of sober sophistication." 724 F.3d at 1120. Similarly, here, a reasonable jury might not have found Sansing's efforts to avoid detection "to be inconsistent with a finding that [he] was 'significantly, but only partially, impaired' at the time of the offense." *Id.* (quoting *Gretzler*, 659 P.2d at 17). For example, viewed in the light most favorable to Sansing, a jury could conclude that Sansing's ability to drive a truck a short distance did not defeat his contention that he was significantly, but only partially, impaired. Additionally, a reasonable jury might have interpreted Sansing's confession to Hooper the next day, which the Arizona Supreme Court improperly ignored, as evidence that his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law did not fully return until after he had regained a measure of sobriety.

Because the Arizona Supreme Court failed to conduct a sufficiency review under *Neder*, its harmlessness determination was "contrary to . . . clearly established Federal law," and the panel majority errs in holding otherwise. 28 U.S.C. § 2254(d)(1); *see Amado v. Gonzalez*, 758 F.3d 1119, 1136 (9th Cir. 2014) ("A decision is 'contrary to' Supreme Court precedent 'if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases . . . .'" (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002)) (alteration in original)). As discussed above, however, under current controlling law, it is not enough for a habeas petitioner to satisfy the AEDPA/*Chapman* test; the petitioner must still meet the *Brecht* standard before relief

can be granted. *See supra* pp. 48–49. I turn now to the *Brecht* inquiry.

## III.

Under *Brecht*, "habeas relief must be granted" if the *Ring* error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623 (quoting *Kotteakos*, 328 U.S. at 765).

> [I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence.

*Merolillo v. Yates*, 663 F.3d 444, 454 (9th Cir. 2011) (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)) (alteration in original).

Here, of course, "the underlying error is the absence of a jury itself." *Murdaugh*, 724 F.3d at 1118. Accordingly, as we held in analyzing whether *Ring* error was prejudicial in *Murdaugh*, "the *Brecht* inquiry is whether the absence of a jury as factfinder at the penalty stage 'substantially and injuriously' affected or influenced the outcome." *Id.* (quoting *Merolillo*, 663 F.3d at 454). To answer that question, we ask "whether a rational jury *could* have found" that Sansing had established the (G)(1) mitigating factor. *Id.* (emphasis added). If so, "it is impossible to conclude that

substantial rights were not affected," *Merolillo*, 663 F.3d at 454 (quoting *Kotteakos*, 328 U.S. at 765), as we have no actual jury verdict against which to evaluate whether the verdict would have varied absent a particular trial error. In these circumstances, therefore, the *Brecht* inquiry is the same one the Arizona Supreme Court should have applied in its harmlessness review: "whether the record contains evidence that *could* rationally lead to a contrary finding with respect to the omitted element." *Neder*, 527 U.S. at 19 (emphasis added); *cf. Deck*, 814 F.3d at 985 (addressing a situation in which the *Brecht* analysis "overlap[ped] completely" with the analysis of whether the state court's determination that there was no constitutional error was objectively unreasonable).

Again, the evidence in the record, when properly viewed in the light most favorable to Sansing, was *sufficient* to allow a rational jury to find that that Sansing had proved, by a preponderance of the evidence, that his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was "significantly, but only partially, impaired," *Gretzler*, 659 P.2d at 17—even if a jury might not have been *likely* to make such a finding, *see Schlup*, 513 U.S. at 330. Sansing presented testimony from Kara, who was present at the time of the crime; who knew him well, having been married to him for fourteen years; and who was familiar with both his use of crack cocaine and the effects that drug usually had on him. Kara testified that Sansing was high on crack cocaine when he assaulted Ms. Calabrese, that immediately beforehand he was anxious and uncharacteristically cold, that his demeanor was different from anything she had witnessed before, and that he seemed to be in another world. A jury could reasonably conclude based on Kara's testimony, along with the uncontested evidence of Sansing's long history of drug abuse starting in

childhood, his recent struggle with addiction, and his and Kara's consumption of $750 worth of crack cocaine in the days leading up to the murder, that Sansing had demonstrated significant impairment. *Cf. State v. Hill*, 174 Ariz. 313, 330 & n.7 (1993) (holding that there was sufficient evidence to support the trial court's finding that the (G)(1) mitigating factor was established, where the trial court found that the defendant was "an alcoholic, that [he was] most likely under the influence of alcoholic beverages to some extent at the time of the murder, [and] that [he was] a product of an alcoholic family").

Because Sansing was deprived of his constitutional right to have a jury determine the facts on which his sentence depended, we cannot know what a jury would have done. "That a rational jury might have found that the evidence established the (G)(1) mitigating factor is sufficient to establish prejudice under *Brecht*." *Murdaugh*, 724 F.3d at 1120.

Had a jury found that Sansing had proven the (G)(1) mitigating factor, a reasonable sentencing judge could have weighed the aggravating and mitigating circumstances differently and concluded that the latter were "sufficiently substantial to call for leniency." Ariz. Rev. Stat. § 13-703(E) (1999). Or the Arizona Supreme Court could reasonably have so concluded when it conducted its required independent reweighing of aggravating and mitigating circumstances. *See Sansing I*, 26 P.3d at 1131; *cf. Strickland v. Washington*, 466 U.S. 668, 695 (1984) (holding, in the context of an ineffective-assistance-of-counsel claim, that the prejudice inquiry asks "whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of

aggravating and mitigating circumstances did not warrant death," and further noting that the prejudice inquiry is objective and does "not depend on the idiosyncracies [*sic*] of the particular decisionmaker"). The deprivation of the right to a jury determination therefore had a "substantial and injurious effect" on Sansing's sentence. *Brecht*, 507 U.S. at 623 (quoting *Kotteakos*, 328 U.S. at 765).

Having concluded that Sansing has satisfied both the AEDPA/*Chapman* and *Brecht* tests for prejudicial error, I would grant his petition for a writ of habeas corpus as to Claim 1.