**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GREGORY SPIROS DEMETRULIAS,
*Petitioner-Appellant*,

v.

RONALD DAVIS, Warden, California
State Prison at San Quentin,
*Respondent-Appellee.*

No. 14-99000

D.C. No.
2:07-cv-01335-
DOC

OPINION

Appeal from the United States District Court
for the Central District of California
David O. Carter, District Judge, Presiding

Argued and Submitted January 26, 2021
Pasadena, California

Filed September 23, 2021

Before: M. Margaret McKeown, Kim McLane Wardlaw,
and Ronald M. Gould, Circuit Judges.

Opinion by Judge Wardlaw

# SUMMARY*

## Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of Gregory Spiros Demetrulias's habeas corpus petition governed by the Antiterrorism and Effective Death Penalty Act, in a case in which a jury convicted Demetrulias of first-degree murder, found that Demetrulias killed the victim in the course of a robbery, and imposed the death penalty.

Demetrulias argued that the trial court violated his right to due process when it allowed the prosecution to introduce victim character evidence during its case in chief, in a preemptive attack on Demetrulias's assertion of self-defense. The panel held that even assuming its review is not barred by the procedural default doctrine, the admission of the statements about the victims' characters did not rise to the level of constitutional error, where the challenged testimony was brief and non-inflammatory, the testimony did not seek to portray Demetrius as evil but rather the victims as non-violent, and the prosecution's case against Demetrius was quite strong.

Demetrulias contended that the trial court denied him due process by refusing to give his requested claim-of-right instruction. The crux of Demetrulias's claim was that if the trial court had given the instruction, the jury would have had a legal basis for finding that Demtrulias intended to collect a debt the victim owed to him—and not to rob him of his

---

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

money or possessions—thereby negating the specific intent to prove robbery, such that the jury would have acquitted Demetrulias of the sole special circumstance charge. The panel held that based on the facts presented to the jury, the California Supreme Court did not unreasonably determine that any error in failing to give the instruction was harmless under *Chapman v. California*, 386 U.S. 18 (1967).

Demetrulias contended that the trial court violated his due process rights when it refused to give his requested instruction of voluntary manslaughter based on heat of passion. Assuming error, the California Supreme Court concluded that any error was harmless beyond a reasonable doubt under *Chapman*. The panel held that the California Supreme Court's conclusion was reasonable.

Demetrulias asserted that his trial counsel was constitutionally ineffective at the penalty phase of his trial by failing to present mitigating evidence of organic brain damage and mental health diagnoses. Because the California Supreme Court summarily denied this claim on the merits, Demetrulias can prevail only if he shows that there was no reasonable basis for the California Supreme Court's decision. The panel held that the California Supreme Court could reasonably have concluded that trial counsel made a reasonable strategic decision in not presenting this evidence. The panel therefore did not need to address whether Demetrulias was prejudiced by any deficiency or whether any evidentiary hearing is warranted.

Demetrulias contended that the cumulative effect of the trial court's guilt and penalty error deprived him of a fair trial by preventing him from effectively defending against the prosecution's felony murder charge. The panel concluded that because none of Demetrulias's claims rise to the level of

constitutional error, there is nothing to accumulate to a level of a constitutional violation.

## COUNSEL

Lauren Collins (argued) and Michael D. Weinstein, Deputy Federal Public Defenders; Cuahtemoc Ortega, Federal Public Defender; Office of the Federal Public Defender, Los Angeles, California; for Petitioner-Appellant.

Teresa Torreblanca (argued), Deputy Attorney General; Holly D. Wilkens, Supervising Deputy Attorney General; Julie L. Garland, Senior Assistant Attorney General; Gerald A. Engler, Chief Assistant Attorney General; Rob Bonta, Attorney General; Office of the Attorney General, San Diego, California; for Respondent-Appellee.

## OPINION

WARDLAW, Circuit Judge:

In 1995, Gregory Spiros Demetrulias was sentenced to death for the fatal stabbing of Robert Miller. At trial, Demetrulias admitted to killing Miller, but claimed that he did so in a struggle initiated by Miller when Demetrulias visited his home to collect a $40 debt that Miller owed him. The prosecution maintained that Demetrulias stabbed Miller in the commission of a robbery. The jury convicted Demetrulias of first-degree murder, found that Demetrulias killed Miller in the course of a robbery, and imposed the death penalty.

This appeal arises from the district court's denial of Demetrulias's federal petition for a writ of habeas corpus, which is governed by the Antiterrorism and Effective Death Penalty Act of 1996. We review six certified issues and affirm the district court's denial of habeas relief.

## I.

### A.

In January 1989, 35-year-old Gregory Demetrulias was living with his parents in Riverside, California. On the evening of January 10, Demetrulias drank at least a case of beer and took a handful of prescription medications. Staggering and slurring his words, Demetrulias was in no condition to go out—but he was adamant about leaving the house. Following an argument with his parents, Demetrulias's mother agreed to drive him to the Round Up Bar. She gave him $30 or $40 that she had been holding for him and dropped him off at the bar.

Demetrulias had regularly frequented the bar over the preceding month or so, as had Robert Miller. According to Demetrulias, he and Miller met while drinking at the Round Up Bar in December 1988 and had spoken a few times after that. About January 6, 1989, Demetrulias lent Miller $40, which Miller promised to repay at the bar on the evening of January 10.

Upon arriving at the Round Up Bar that evening, Demetrulias ordered a beer, drank half of it, and angrily slammed it down. The bartender asked him to leave. Demetrulias finished his beer and stated as he left the bar that he was going to get another at the adjacent Stop-and-Go convenience store. Shortly thereafter, a bar patron observed

Demetrulias pacing between the adjoining parking lots as he drank from a can.

At roughly 9:30 P.M., Demetrulias left the parking lot. He arrived at a nearby boarding house where Miller lived, the Mar Mac Manor, at around 10:00 P.M. Miller's fellow Mar Mac Manor second-floor resident, Robert Hanshaw, awoke to the sound of someone running up the stairs. Hanshaw then heard a voice loudly demand, "Give me your wallet." Shortly thereafter, Hanshaw heard steps descending the stairs. Miller then came out of his room, announcing: "He stabbed me in the heart. He's killed me."

Eric Carson, a first-floor resident of the boarding house, also witnessed the incident. Between 9:30 and 10:00 P.M., he overheard banging and stomping, then someone say in an aggressive voice: "Give me your money. Give me your wallet." Carson went out into the first-floor hallway, where he was joined by the building manager, Herb Hamilton. After Hamilton yelled something, Carson saw Demetrulias, who appeared to have something in his hand, rush down the stairs and leave through the front door. Miller then staggered down the stairs, stated that he had been stabbed in the heart, and collapsed before Hamilton and Carson.

Demetrulias fled to the home of Clarence Wissel, an 82-year-old man with whom his father had done business. Wissel opened the door with a gun in his hand. When Wissel raised the gun, Demetrulias pulled out a pocketknife and stabbed Wissel three times. Wissel then went to another room to grab the telephone, but Demetrulias hit him with the phone and disabled the gun by removing the cylinder, then tied Wissel up with the phone cord and immobilized him with a toppled dresser. Demetrulias then ransacked the house. He drank roughly eight beers from the refrigerator, took a handful of Valium, and collected cash and other items.

Authorities determined that Miller had died of a seven-inch-deep stab wound to his chest.  He had also been stabbed in the face, back, and upper arm.  All the wounds were inflicted with a single bevel knife.  Officers found a knife blade matching this description, almost eight inches long and covered in blood, directly outside of Miller's room.  A drawer containing knives and other implements was partially open in the first-floor kitchen.  Miller's wallet was found in a fanny pack on his dresser.  The wallet was empty, but $34.70 in cash was recovered from Miller's pocket.

At roughly 4:30 A.M., an investigating officer encountered Demetrulias walking on a street near the Mar Mac Manor, appearing intoxicated.  The officer identified Demetrulias as resembling a composite sketch based on Carson's depiction of the assailant.  When the officer approached, Demetrulias was evasive.  The officer detained and searched him, finding $1,274 in cash in his pockets, two knives, numerous coins, four .38-caliber cartridges, a wallet, and a drug prescription bottle that bore Wissel's name.  The officer also noticed bloodstains on Demetrulias's clothing.  A blood sample taken at 10:15 A.M. that morning revealed a blood-alcohol level of .04 (suggesting a much higher level hours earlier), a therapeutic-range level of diazepam (Valium), and an unknown amount of Lorazepam (another sedative).

After arresting Demetrulias, police went to Wissel's house and found that it had been ransacked.  Wissel's belongings were strewn about the doorway, driveway, and across the street.  Officers found Wissel in a bedroom beneath a heavy dresser, bound by a telephone cord, with dried blood on his face.  In the same room, police found a wallet with Demetrulias's identification and a revolver with the cylinder removed.  Beer bottles and a knife were in the

kitchen sink, and another knife was on the washing machine. Wissel's dentures were found in a toilet. Wissel had suffered stab wounds to his neck, elbow, and chest, as well as brain injuries, and was comatose when he arrived at the hospital.

In a field halfway between the Mar Mac Manor and Wissel's house, officers found prints matching the shoes that Demetrulias was wearing when he was arrested. The same shoe prints were found at and around Wissel's home. A woman who lived by the field had heard her neighbor's dogs bark loudly around 10:00 P.M., which suggested to her that someone was outside.

Demetrulias was charged with the first-degree murder of Miller.[1] Prosecutors sought the death penalty based on the special circumstance of first-degree murder arising out of robbery or attempted robbery.

### B.

Initially, Demetrulias was represented by the Riverside County Public Defender's Office. In late 1991, attorney Karla Sandrin replaced the office, and Peter Scalisi joined her in early 1993. Scalisi assumed primary responsibility for the guilt portion of the trial, and Sandrin focused on the penalty phase.

Trial began in 1995. During its case-in-chief, the prosecution briefly presented evidence regarding Miller's and Wissel's non-threatening natures. Defense counsel objected on the bases of relevance, speculation, and foundation, all of which were overruled. Several weeks

---

[1] In a separate case not at issue in this appeal, Demetrulias was charged with, and ultimately pled guilty to, assaulting Wissel.

later, defense counsel moved to strike the testimony, this time arguing that the testimony was impermissible victim character evidence. The court denied the motion.

Demetrulias testified at his trial, advancing a theory of self-defense. By his own account, he entered the Mar Mac Manor through the front door and went up the stairs to Miller's room. Miller's door was open, and Miller was sitting watching television. From the doorway, Demetrulias asked Miller why he had not been at the Round Up Bar and whether he had Demetrulias's money. Miller replied that he was broke and that he did not know when he would have the money. Demetrulias entered the threshold and an argument ensued. Miller reached down, picked something up, then charged at Demetrulias with a knife in hand. Demetrulias wrestled the knife away from Miller and stabbed him in the face, but Miller came at him again with his fists. Demetrulias then stabbed Miller in the side of his chest. Miller kept coming, and Demetrulias stabbed him in his back and the back of his arm while pushing him off. Demetrulias fell in the struggle, and the knife blade broke off.

Sensing that Miller "had had enough," Demetrulias testified that he left without taking anything from Miller's pockets. Still holding the handle of the broken knife, Demetrulias descended the stairs. When he saw Carson at the bottom, he explained, "We got into it, he attacked me." Demetrulias then fled the Mar Mac Manor in search of a telephone to call his mother.

After the close of the evidence, defense counsel requested two jury instructions relevant to this appeal. Throughout trial, Demetrulias's sole defense to the special circumstance robbery charge was that he had gone to the Mar Mac Manor to collect the $40 that Miller owed him. Consistent with this theory, he requested that the jury be

instructed that "[a] belief in the right to reclaim one's property negates the specific intent necessary to constitute robbery. If such specific intent is not present at the time of the alleged offense then the special circumstance of robbery, or attempted robbery, is not proved." Second, Demetrulias requested that the jury be instructed on the lesser included offense of voluntary manslaughter based "upon a sudden quarrel or heat of passion . . . ." The trial court declined to give either instruction.

The jury found Demetrulias guilty of first-degree murder. It also found true the special circumstance of murder in the commission of robbery.

## C.

During the penalty phase, Sandrin took the lead. In preparation for the proceedings, Sandrin had consulted with at least two doctors who had written extensive reports after evaluating Demetrulias for potential mental illnesses and organic brain damage. She also had hundreds of pages of prison medical records that spanned almost a decade, as well as the evaluations conducted by two psychologists in connection with the Wissel assault charges brought against Demetrulias.[2]

The prosecution's evidence in aggravation focused on gruesome details from the Wissel assault and how Miller's death affected his family. The prosecution also introduced evidence of several prior violent crimes that Demetrulias had

---

[2] The record also indicates that Sandrin investigated whether "toxic dumping" near Demetrulias's school caused "episodic moments of dyscontrol and organic brain type problems."

committed as well as evidence of violent acts he committed while in custody in the Riverside County jail.

Ultimately, Sandrin chose not to present the evidence regarding Demetrulias's mental illness and organic brain damage. Instead, the defense's case in mitigation focused on rebutting the prosecution's version of his violent behavior in jail. Friends and family also testified that Demetrulias was generally a kind and caring person but began drinking and taking drugs in his twenties and became paranoid while under the influence. The defense's only expert witness, Dr. Stephen Pittel, testified generally about heroin use, addiction, and withdrawal; however, because he had not reviewed any records, interviewed any witnesses, or ever met with Demetrulias, he could not testify to anything specific about the case. In closing, Sandrin emphasized that according to toxicology and pharmacology testimony introduced at the guilt phase, Demetrulias was on anti-anxiety and anti-psychotic medications when he was arrested.

Following three days of deliberation, the jury sentenced Demetrulias to death.

### D.

On direct appeal, the California Supreme Court affirmed Demetrulias's conviction and sentence. *See People v. Demetrulias*, 39 Cal. 4th 1 (2006) ("*Demetrulias*"). The United States Supreme Court denied certiorari. *See Demetrulias v. California*, 549 U.S. 1222 (2007).

Demetrulias challenged his conviction and sentence in two state habeas corpus petitions. The California Supreme Court summarily denied Demetrulias's first state habeas

petition on September 17, 2008, and his second on June 17, 2010.

Demetrulias initiated federal habeas proceedings on February 28, 2007 and filed the operative Second Amended Petition on November 12, 2010. The district court denied Demetrulias's petition in two separate orders. The district court entered final judgment on December 20, 2013 and denied a Certificate of Appealability ("COA") as to all claims. Demetrulias timely appealed.

Initially, we certified only three claims: Claim III, which argued ineffective assistance of counsel at the penalty phase; Claim XX(B), which contended that the trial court's refusal to give a claim-of-right instruction violated due process; and Claim XX(C), which maintained that the trial court's refusal to instruct the jury on a heat of passion theory of voluntary manslaughter violated due process. Demetrulias's opening brief sought certification of three additional claims: Claim XI(B), which asserted that the trial court violated his due process rights by erroneously admitting evidence of Miller's and Wissel's nonviolent character during the guilt phase; and Claims VI and XVIII, that the trial was rendered fundamentally unfair by cumulative errors at the guilt and penalty phases, limited to the certified issues. We granted an expanded COA and directed the parties to file supplemental briefing on the additional claims. We held oral argument on January 26, 2021.

## II.

We review the district court's denial of habeas relief de novo. *Panah v. Chappell*, 935 F.3d 657, 663 (9th Cir. 2019).

Because Demetrulias filed his federal habeas petition after April 24, 1996, our review is governed by the

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996). Under AEDPA, we must defer to a state's court decision on any claim that was adjudicated on the merits unless the decision was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). This is a "highly deferential standard for evaluating state-court rulings." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)).

Generally, we apply AEDPA's deferential standard of review to the "last reasoned state-court decision." *Martinez v. Cate*, 903 F.3d 982, 991 (9th Cir. 2018) (quoting *Van Lynn v. Farmon*, 347 F.3d 735, 738 (9th Cir. 2003)). But we also apply it when the state court has summarily denied relief. *Cullen v. Pinholster*, 563 U.S. 170, 187 (2011); *Harrington v. Richter*, 562 U.S. 86, 98–99 (2011). "In these circumstances, [a petitioner] can satisfy the 'unreasonable application' prong of § 2254(d)(1) only by showing that 'there was no reasonable basis' for the California Supreme Court's decision." *Pinholster*, 563 U.S. at 187–88 (quoting *Richter*, 562 U.S. at 98). Thus, when a state court rules on a petition summarily, "a habeas court must determine what arguments or theories . . . could have supported[] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Richter*, 562 U.S. at 102. Even if we would grant federal habeas relief if we were reviewing de novo, § 2254(d) precludes such relief if there are

"arguments that would otherwise justify the state court's result . . . ." *Id.*

For many of Demetrulias's certified claims, the California Supreme Court denied relief in a reasoned opinion on direct appeal. *See Demetrulias*, 39 Cal. 4th at 20–22 (victim character evidence); *id.* at 22–24 (claim-of-right instruction); *id.* at 24–25 (heat of passion instruction). For these claims, the California Supreme Court's merits decision is the last reasoned decision to which we turn our review.

For Demetrulias's remaining claims—namely, his claims of ineffective assistance of counsel and cumulative error—the California Supreme Court summarily denied relief on post-conviction review of the merits. The post-conviction decision is "unaccompanied by an explanation," but Demetrulias nonetheless bears the burden of demonstrating that "there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. "Because the state court did not provide any underlying reasoning for its adjudication on the merits, we conduct an independent review of the record to determine whether the state court's final resolution of those claims constituted an unreasonable application of clearly established federal law." *Noguera v. Davis*, 5 F.4th 1020, 1035 (9th Cir. 2021).

## III.

### A.  Victim Character Evidence

Demetrulias argues that the trial court violated his right to due process when it allowed the prosecution to introduce victim character evidence during its case in chief. In a preemptive attack on Demetrulias's assertion of self-defense, the prosecution introduced evidence of Miller's and Wissel's non-aggressive and non-violent characters. For

example, a cashier at a restaurant frequented by Miller testified that she had never seen him act "hostile," "threatening," or "violent" towards anyone. A bartender at the Round Up Bar testified that Miller was "nice," spoke "very politely," and never appeared "angry," "hostile," or "threatening." Finally, Wissel's daughter testified that her father was a "quiet man" who "avoided conflict."

On direct appeal, the California Supreme Court concluded that trial counsel forfeited this claim because counsel "fail[ed] to make a timely objection" on the correct ground. *Demetrulias*, 39 Cal. 4th at 19–20. Although defense counsel had lodged various objections on the grounds of relevance, speculation, and foundation, these objections did not "alert the trial court to the claim that the testimony objected to is inadmissible character evidence." *Id.* at 21. And although counsel raised the proper objection "some days" later in a motion to strike the testimony, the motion was untimely. *Id.* Rather, to satisfy California Evidence Code section 353(a), also known as the contemporaneous objection rule, an objection "must be both timely *and* specific as to its ground." *Id.* at 22. As the California Supreme Court explained, "[a]n objection to evidence must generally be preserved by specific objection at the time the evidence is introduced; the opponent cannot make a 'placeholder' objection stating general or incorrect grounds (e.g., 'relevance') and revise the objection later in a motion to strike stating specific or different grounds." *Id.*; *see also* Cal. Evid. Code § 353(a).

The district court concluded that Demetrulias did not show "cause and prejudice to excuse the procedural bar based on counsel's failure to make a contemporaneous objection." Alternatively, the district court held that "even if the trial court's ruling on this evidence had been

erroneous, [Demetrulias] cannot show that the admission of this evidence rendered his trial so fundamentally unfair as to violate his due process."

Even assuming our review is not barred by the procedural default doctrine, *see Bennett v. Mueller*, 322 F.3d 573, 580–86 (9th Cir. 2003), we agree that the admission of this evidence did not violate Demetrulias's due process rights.[3]

"It is well settled that a state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process." *Spivey v. Rocha*, 194 F.3d 971, 977–78 (9th Cir. 1999); *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991) ("[I]t is certainly possible to have a fair trial even when state standards are violated . . ."). The admission of character evidence violates due process only if there are no permissible (i.e., non-propensity) inferences that the jury may draw from the evidence and the evidence was "of such quality as necessarily prevents a fair trial." *McKinney v. Rees*, 993 F.2d 1378, 1384 (9th Cir. 1993) (quoting *Kealohapauole v. Shimoda*, 800 F.2d 1463, 1465 (9th Cir. 1986)). In addition to error, a habeas petitioner must establish actual prejudice, meaning a substantial and injurious effect on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see also Bonin v. Calderon*, 59 F.3d 815, 823–24 (9th Cir. 1995).

---

[3] Because the California Supreme Court denied this claim on procedural grounds, our review is de novo. *See James v. Ryan*, 733 F.3d 911, 914 (9th Cir. 2013) (noting that AEDPA review "does not apply when a state court does not reach the merits of a federal claim").

Demetrulias argues the introduction of this victim character evidence rendered the trial fundamentally unfair because it engendered sympathy for Miller and undercut Demetrulias's theory of self-defense, especially because the prosecution referred back to it during closing argument and contrasted it with Demetrulias's more aggressive nature. The State counters that the testimony was brief, and its admission did not rise to an error of constitutional magnitude.

In *McKinney v. Rees*, we addressed the circumstances under which the admission of character evidence violates due process.   In that case, the victim—the defendant's mother—died after her throat was slit.   993 F.2d at 1381. The prosecution introduced a litany of evidence regarding the defendant's apparent "fascination" with knives.  *Id.* at 1382.   For example, the court admitted evidence that the defendant was proud of his knife collection, that he had on occasion strapped a knife to his body while wearing camouflage pants, and that he had used a knife to scratch the words "Death is His" on a door in his dormitory room.  *Id.* We held that because this evidence was not offered to prove opportunity, but rather was an "impermissible propensity inference based on other acts offered to prove character," it was erroneously admitted by the trial court.  *Id.* at 1383; *see also id.* at 1383 n.6.

Having reached that conclusion, we considered "whether the erroneously admitted evidence was 'of such quality as necessarily prevents a fair trial.'"  *Id.* at 1384 (quoting *Kealohapauole*, 800 F.2d at 1465).   We observed that the evidence was "emotionally charged" and pervaded the entirety of the trial—over sixty pages of testimony referenced the defendant's knife ownership and camouflage pants.  *Id.* at 1385–86.   What is more, the prosecution's case

was not "weighty," but rather based solely on circumstantial evidence. *Id.* at 1386. Indeed, the defendant never confessed to the killing and the murder weapon was never identified. *Id.* at 1381, 1385. Under these circumstances, we held that it was highly probable that the character evidence had a strong impact on the minds of the jurors, and it therefore rendered the trial fundamentally unfair. *Id.* at 1386.

This case differs substantially from the circumstances presented in *McKinney*. The challenged character testimony at issue here was brief and non-inflammatory, especially in comparison to the sixty pages of emotionally charged testimony in *McKinney*. Moreover, the testimony did not seek to portray Demetrulias as evil, but rather the victims as non-violent. Finally, the prosecution's case against Demetrulias was quite strong, and benefitted from significant direct, rather than circumstantial, evidence. The erroneous admission of these fleeting statements about the victims' characters therefore does not rise to the level of constitutional error. *See Correll v. Stewart*, 137 F.3d 1404, 1417 (9th Cir. 1998) (finding no due process violation where the prosecution "elicited just one mention of [the defendant's] marijuana possession" and "the properly admitted evidence of [the defendant's] guilt was substantial").

## B. Claim-of-Right Instruction

Demetrulias contends that the trial court denied him due process by refusing to give his requested claim-of-right instruction to the jury. The defense of "claim of right" or reclaiming one's own property, here, collecting a debt, was a defense to robbery at the time of Demetrulias's trial, but is no longer. The rejected instruction provided:

> A belief in the right to reclaim one's property
> negates the specific intent necessary to
> constitute robbery. If such specific intent is
> not present at the time of the alleged offense
> then the special circumstance of robbery, or
> attempted robbery, is not proved.

The jury was, however, instructed "generally on the need to find specific intent to rob or steal . . . ." *Demetrulias*, 39 Cal. 4th at 24; *see also id.* at 23 ("[T]he jury was instructed on the element of specific intent to take property from another and deprive the other person permanently of that property necessary for a finding of robbery, and hence murder in the commission of a robbery, as well as on the specific intent to rob necessary to find attempted robbery.").

The crux of Demetrulias's claim is that if the trial court had given the claim-of-right instruction then the jury would have had a legal basis for finding that Demetrulias intended to collect a debt Miller owed to him—and not to rob Miller of his money or possessions—thereby negating the specific intent required to prove robbery. Accordingly, he insists, the jury would have acquitted him of the sole special circumstance charge, and his trial would not have proceeded to the penalty phase.

On direct appeal, the California Supreme Court recognized that the evidence presented "theoretical[ly] . . . supported the giving of a claim-of-right instruction under [the prevailing law at the time.]" *Id.* at 23 (citing *People v. Butler*, 65 Cal. 2d 569 (1967)).[4] However, it held that any error was "harmless beyond a reasonable doubt" under

---

[4] At oral argument before us, the State conceded error on the failure to give the claim of right instruction.

*Chapman v. California*, 386 U.S. 18, 24 (1967). *Demetrulias*, 39 Cal. 4th at 24. The court observed that Demetrulias's claim that he "went to Miller's room merely to collect a debt was closely tied to the claim of self-defense." *Id.* at 23.[5] The court reasoned that there was "no reasonable basis on which a jury could have rejected self-defense but accepted a claim-of-right claim"; in other words, the "same reasons" for rejecting Demetrulias's claim of self-defense also supported rejecting his claim-of-right defense. *Id.* at 23–24.

In federal habeas proceedings, the district court concluded that Demetrulias's claim was "without merit in view of the fact that the jury necessarily rejected [his] version of the incident that he acted in self-defense in favor of the substantial evidence to the contrary, which also applied to [his] claim-of-right theory." The district court therefore concluded that Demetrulias could not demonstrate actual prejudice.

Because the California Supreme Court held that any error in failing to give this instruction was harmless under *Chapman*, our "highly deferential AEDPA standard [of review] applies." *Davis v. Ayala*, 576 U.S. 257, 269 (2015). Thus, "we may not overturn the California Supreme Court's decision unless that court applied *Chapman* 'in an "objectively unreasonable" manner.'" *Id.* (quoting *Mitchell v. Esparza*, 540 U.S. 12, 18 (2003) (per curiam)). "When a *Chapman* decision is reviewed under AEDPA, 'a federal

---

[5] Indeed, defense counsel argued "the special circumstance was not proved because the evidence showed 'that Greg Demetrulias was in Mr. Miller's room over a debt, not a robbery. And that Greg Demetrulias acted in self-defense when Mr. Miller came at him with a knife.'" *Demetrulias*, 39 Cal. 4th at 23.

court may not award habeas relief under § 2254 unless the *harmlessness determination itself* was unreasonable.'" *Ayala*, 576 U.S. at 269 (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007) (emphasis in original)). "And a state-court decision is not unreasonable if 'fairminded jurists could disagree' on [its] correctness." *Ayala*, 576 U.S. at 269 (quoting *Richter*, 562 U.S. at 101). Thus, to meet this standard, Demetrulias "must show that the state court's decision to reject this claim 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Ayala*, 576 U.S. at 269–70 (quoting *Richter*, 562 U.S. at 103).[6]

Against these standards, we cannot conclude that the California Supreme Court's harmlessness determination was unreasonable. The court reasonably observed that much of the same factual evidence that supported Demetrulias's claim-of-right defense also went to his self-defense claim. The California Supreme Court noted in passing that:

> [T]he jury was instructed on the element of specific intent to take property from another and deprive the other person permanently of that property necessary for a finding of robbery, and hence murder in the commission of a robbery, as well as on the specific intent to rob necessary to find attempted robbery.

---

[6] As we recently explained, "the Supreme Court has instructed that we 'need not formally apply both *Brecht* and AEDPA/*Chapman*,' since the analysis under both approaches will lead to the same result." *Sansing v. Ryan*, 997 F.3d 1018, 1030 (9th Cir. 2021) (quoting *Ayala*, 576 U.S. at 268).

*Demetrulias*, 39 Cal. 4th at 23. But in light of defense counsel's argument that robbery "was not proved because the evidence showed that 'Greg Demetrulias was in Mr. Miller's room over a debt, not a robbery. And that Greg Demetrulias acted in self-defense when Mr. Miller came at him with a knife,'" the California Supreme Court reasonably concluded that the claim of right theory—defendant went to Miller's room to collect a debt— was closely tied to the self-defense theory. *Id*. That conclusion formed the basis of its harmlessness determination, not the fact that the robbery specific intent instruction was given.

Perhaps the California Supreme Court recognized, as we do, that the robbery instruction was inadequate to cover the separate claim of right defense. Under the robbery instruction that was given, if Demetrulias was found to have the specific intent to take money that belonged to him, that would still constitute a specific intent to rob, and hence, robbery. The jury was not given a definition of robbery that excluded taking anything that belonged to the defendant himself, which a claim of right instruction would have accomplished.

However, based on the facts adduced at trial, the jury was given very little reason to believe that Demetrulias was collecting a $40 debt or acting in self-defense when he sought to do so. As the California Supreme Court explained:

> Defendant's self-serving testimony regarding the debt was completely uncorroborated;[7]

---

[7] Demetrulias argues that the California Supreme Court's determination that his claim-of-right defense, like his self-defense claim, "rested solely" on his testimony was an "unreasonable determination of the facts" under 28 U.S.C. § 2254(d)(2). This assertion is belied by

whether he and Miller were even acquainted was disputed, but no evidence other than defendant's testimony existed to show Miller had borrowed money from defendant. Miller's fellow tenants heard his killer demand, "Give me your wallet," not "Give me the $40 you borrowed." Circumstantial evidence suggested defendant took the knife he used to kill Miller from the Mar Mac Manor kitchen on his way to Miller's room; he would have had no reason to take a knife if he had come simply to ask for his $40. The number and severity of the stab wounds defendant inflicted on Miller strongly suggested defendant's intent was not limited either to repelling an attack from the older man or recovering his loan. Defendant fled from the scene, indicating consciousness of guilt, and later falsely denied any knowledge of the events. Shortly after killing Miller, defendant assaulted Wissel, who had not borrowed any money from him, and stole more than $1,000 and much additional property from Wissel. If defendant's intent with Miller were simply to seek repayment of

---

Demetrulias's own observation that "[t]he claim-of-right defense rested *largely*, but not exclusively on [his] testimony." Moreover, as the State argues, the evidence Demetrulias suggests is corroborating is inconclusive, at best: the owner of the Round Up Bar testified inconsistently on whether she had seen Demetrulias and Miller in the bar together; the $10 pawn shop receipt found in Miller's pocket did not prove that Miller had a history of failing to repay his debts; and the fact that Miller's room was not ransacked could also support the inference that Demetrulias was interrupted and prevented from completing the robbery.

> a $40 debt, why would he come armed with a
> kitchen knife, stab Miller four times, flee the
> scene, and shortly thereafter attack an even
> more vulnerable victim and take from him
> many times the amount of Miller's supposed
> debt?

*Demetrulias*, 39 Cal. 4th at 23–24.

This evidence and the reasonable inferences the jury
could draw from it "cast[] great doubt on defendant's version
of events," and reasonably support "both defense theories."
*Id.* at 24. The jury found Demetrulias guilty of first-degree
murder, and, in so doing, necessarily rejected his
uncorroborated testimony both that he went to collect a
$40 debt from Miller and that he acted in self-defense.
Based on the facts presented to the jury, the California
Supreme Court's harmlessness determination under
*Chapman* was not unreasonable. *See Ayala*, 576 U.S. at 269.
Even if we would not make the same harmlessness
determination on de novo review, "[t]he 'possibility for
fairminded disagreement' requires us to defer to the state
court's determination, regardless of whether we would have
reached the same conclusion following an independent
review of the record." *Sansing*, 997 F.3d at 1033 (quoting
*Richter*, 562 U.S. at 103).

## C.  Heat of Passion Instruction

Demetrulias also contends that the trial court violated his
due process rights when it refused to give his requested
instruction of voluntary manslaughter based on heat of
passion.  Demetrulias's requested instruction defined
voluntary manslaughter as: "Upon a sudden quarrel or in the
heat of passion, or the honest, even though unreasonable
belief in the necessity to defend oneself against the imminent

peril to life or great bodily injury." The trial court refused to give the full instruction, reasoning that the evidence was more consistent with a voluntary manslaughter charge based on "the honest but unreasonable belief in the necessity to defend oneself," rather than "heat of passion or sudden quarrel." Thus, the trial court instructed the jury on two lesser included offenses: second-degree murder and voluntary manslaughter based on unreasonable self-defense.

Assuming error, the California Supreme Court concluded that any error was harmless under *Chapman*:

> The jury found true the special circumstance allegation that defendant killed Miller in the course of, and in order to advance, the commission or attempted commission of a robbery. The robbery-murder special-circumstance finding also dictated a finding of first degree felony murder . . . and the corresponding felony-murder instruction, which was properly given. The failure to instruct on one theory of voluntary manslaughter was therefore harmless, as the jury necessarily determined the killing was first degree murder, not manslaughter, under other properly given instructions.

*Demetrulias*, 39 Cal. 4th at 25.

Demetrulias argues that the California Supreme Court was "unreasonable in concluding that the felony-murder instruction cured the error . . . because the jury was never properly instructed on robbery, [and thus] it was not properly instructed on felony-murder based on a robbery theory."

However, under the same standards we just articulated, we cannot conclude that the California Supreme Court's application of *Chapman* was objectively unreasonable. *See Ayala*, 567 U.S. at 269–70 ("[The petitioner] therefore must show that the state court's decision to reject his claim 'was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" (quoting *Richter*, 562 U.S. at 103)).

Contrary to Demetrulias's argument, the trial court instructed the jury that "*if* you find the defendant guilty of murder of the first degree, . . . *then* you shall also make a finding . . . as to whether the murder was committed while the defendant was engaged in the commission of, attempted commission of, and immediate flight after committing and attempting to commit the crime of robbery . . . ." In other words, the jury could only have reached the special circumstance finding *after* finding Demetrulias guilty of first-degree murder. Thus, even if the jury was improperly instructed on robbery, it did not affect the jury's first-degree murder finding. An additional voluntary manslaughter instruction based on heat of passion would not have changed this result, "as the jury necessarily determined the killing was first degree murder, not manslaughter, under other properly given instructions." *Demetrulias*, 39 Cal. 4th at 25. Accordingly, even assuming the trial court erred by refusing to give a heat of passion instruction, the California Supreme Court reasonably concluded that the error was harmless beyond a reasonable doubt. *See Chapman*, 386 U.S. at 24; *see also Beardslee v. Woodford*, 358 F.3d 560, 577 (9th Cir. 2004).

## D. Ineffective Assistance at Penalty Phase

Demetrulias also asserts that his trial counsel was constitutionally ineffective at the penalty phase of his trial. Demetrulias contends that his right to counsel was violated when Karla Sandrin, lead counsel during the penalty phase, failed to present mitigating evidence of organic brain damage and mental health diagnoses.[8]  The California Supreme Court summarily denied this claim on the merits.

To show a violation of that right, Demetrulias must demonstrate that (1) Sandrin's performance was deficient, and (2) "there is a reasonable probability that, but for counsel's professional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984). Because AEDPA guides our review, we ask whether the California Supreme Court "applied *Strickland* to the facts of [t]his case in an objectively unreasonable manner." *Bell v. Cone*, 535 U.S. 685, 698–99 (2002).  "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (cleaned up).  In evaluating whether a state court decision is an unreasonable application of *Strickland*, we "consider only the evidence that was before the state court at the time of its ruling." *Avena v. Chappell*, 932 F.3d 1237, 1247 (9th Cir. 2019) (quoting *Pinholster*, 563 U.S.

---

[8] We have previously clarified that these are "two separate but complementary defense strategies" available at mitigation. *Elmore v. Sinclair*, 799 F.3d 1238, 1250 (9th Cir. 2015).  The mental health defense "refers to the presentation of mitigating factors related to [Demetrulias's] possible mental disorders," including physical abuse and neuropsychological impairment. *Id.*  The brain damage defense "refers to mitigating factors related to [Demetrulias's] physical brain damage from prior head injuries" and exposure to toxic agents. *Id.*

at 182).  Because we are reviewing a summary merits denial, Demetrulias can prevail on this claim only if he shows that "there was no reasonable basis for the California Supreme Court's decision." *Pinholster*, 563 U.S. at 188.  We therefore must determine "what arguments or theories . . . could have supported[] the state court's decision; and then [we] must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior" Supreme Court decision. *Richter*, 562 U.S. at 102.

We turn first to the requirement that Demetrulias demonstrate that his counsel's performance was "deficient," or more precisely, "fell below an objective standard of reasonableness . . . under prevailing professional norms." *Strickland*, 466 U.S. at 687–88.  As habeas counsel confirmed at oral argument before this court, Demetrulias does not argue that trial counsel was deficient in failing to investigate potential mental illness and brain damage.  To the contrary, he recognizes that "[c]ounsel's investigation . . . gave them a profound understanding of the powerful mitigation evidence they could present to the jury."  Instead, Demetrulias's claim centers on his assertion that counsel's tactical decision not to present this mitigating evidence was unreasonable.  We believe, however, that the California Supreme Court could reasonably have concluded that trial counsel made a reasonable strategic decision in not presenting this evidence.

We have recognized that counsel has a duty to present and explain all available mitigating evidence, absent a tactical reason for not doing so.  *See Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995); *Stankewitz v. Wong*, 698 F.3d 1163, 1172 (9th Cir. 2012).  "To fail to present important mitigating evidence in the penalty phase—if there

is no risk in doing so—can be as devastating as a failure to present proof of innocence in the guilt phase." *Hamilton v. Ayers*, 583 F.3d 1100, 1113–14 (9th Cir. 2009) (quoting *Mak v. Blodgettt*, 970 F.2d 614, 619 (9th Cir. 1992) (per curiam)). However, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ." *Strickland*, 466 U.S. at 690. Moreover, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91. We must begin with the presumption that "the challenged action[s] might be considered sound trial strategy." *Pinholster*, 563 U.S. at 191 (quoting *Strickland*, 466 U.S. at 689).

The state court record supports the conclusion that trial counsel made a strategic decision not to present the mental health and organic brain damage evidence at the penalty phase. When Sandrin assumed responsibility for the case, significant mitigation evidence had already been unearthed by the public defender. For example, in 1991, prior counsel hired Dr. Richard Hall to "conduct a complete neuropsychological evaluation" of Demetrulias, particularly to determine whether there was evidence of any "organic brain damage." Dr. Lorna Forbes was also retained to "psychiatrically evaluate . . . Mr. Demetrulias's state of mind at the time of the commission of the offense . . . ." Among other findings, Dr. Hall and Dr. Forbes concluded that Demetrulias suffered from organic brain damage and psychosis. Both doctors generated detailed reports and recall reconveying their findings to Sandrin and Scalisi when they joined the case.

Sandrin and Scalisi also had in their possession the reports of Dr. Rath and Dr. Kania—two psychologists who

evaluated Demetrulias in 1989 shortly after his arrest.  In contrast to Dr. Hall and Dr. Forbes, however, these reports cast doubt on whether Demetrulias suffered from mental illness or organic brain damage on the night of Miller's murder.  Dr. Kania concluded that Demetrulias's cognitive functioning was intact and that he "[was] not presenting any symptoms suggestive of any serious psychopathology of psychotic nature."  Similarly, Dr. Rath determined that "[b]y far the most likely situation in terms of the defendant's mental state at the time of the commission of the alleged offense, was that he was not suffering from a major mental illness but that he was experiencing to a degree the effects of various kinds of 'downers.'"  Along with these expert evaluations, Sandrin also inherited hundreds of pages of prison medical records, which contained contradictory conclusions relating to Demetrulias's mental health diagnoses.

Moreover, the record shows that Sandrin conducted her own investigation into possible sources of mitigating evidence.  In September 1992, Sandrin hired a private investigator who collected "a great deal of mental health history."  Sandrin also looked into whether exposure to toxic waste during Demetrulias's youth could have caused organic brain damage.

The trial record supports the conclusion that counsel made a tactical decision not to introduce this evidence.  For example, during the guilt portion of the trial, Scalisi confirmed that the team had in its possession the evaluations conducted by Dr. Hall and Dr. Forbes:

> Other lawyers in the case, prior to my becoming counsel for Mr. Demetrulias, have other confidential reports done by different doctors.  I can't remember the dates.  But

certainly after Dr. Kania and Dr. Rath talked to Mr. Demetrulias, in those confidential reports, Mr. Demetrulias gave some very consistent statements to them about what happened that night, what occurred, self-defense, all of those issues we expect him to testify about in his direct.

However, "as a matter of [trial] strategy," Scalisi and Sandrin "agreed not to proffer the additional doctors." Scalisi explained, "We've weighed the pros and cons, . . . and it's our strategic decision not to do that, in light of the fact that their reports would now be discoverable by the prosecution."

At the penalty phase, the parties disputed whether the mental health and brain damage evidence would open the door to harmful rebuttal evidence suggesting Demetrulias was malingering to obtain medication and suffered from antisocial personality disorder. The prosecution argued that if Sandrin introduced evidence suggesting that Demetrulias needed certain medication "because of psychological problems," it would call a doctor who would testify that Demetrulias "didn't have psychological problems, other than being antisocial, and that he was malingering to get the medication." Similarly, the prosecution also represented that if Sandrin put on testimony that Demetrulias suffered from organic brain damage, he would question the expert about Demetrulias's antisocial personality diagnosis.

During state habeas proceedings, Scalisi confirmed what is already apparent from the trial record: "Sandrin ultimately made the decision not to present this type of mental health evidence for the tactical reason that it would have opened the door to past diagnoses of [Demetrulias's as an] . . . anti-

social sociopath which would be highly inflammatory and very prejudicial to Mr. Demetrulias."

The record is thus replete with information demonstrating that trial counsel conducted a thorough investigation into the mitigating mental health evidence and made the strategic decision not to present it. As we have previously held, this type of tactical decision does not constitute deficient performance. Rather, it is an "acceptable trial strategy to choose not to call psychiatrists to testify when they can be subjected to cross-examination based on equally persuasive psychiatric opinions that reach a different conclusion." *Harris v. Vasquez*, 949 F.2d 1497, 1525 (9th Cir. 1990); *see also Elmore v. Sinclair*, 799 F.3d 1238, 1250 (9th Cir. 2015) ("We conclude that defense counsel was not deficient in focusing on a remorse-oriented strategy, rather than presenting evidence related to Elmore's mental health or brain damage."); *Sansing*, 997 F.3d at 1034–35 (holding that counsel was not deficient for failing to present evidence of anti-social personality disorder); *cf. Beardslee*, 358 F.3d at 583 ("Whether or not it may have been better to forgo Dr. Wilkinson's testimony, the record does not show that Beardslee's counsel failed to make reasonable decisions untethered to trial strategy.").

We are careful to note that "an attorney's performance is not immunized from Sixth Amendment challenges simply by attaching to it the label of 'trial strategy.'" *Silva v. Woodford*, 279 F.3d 825, 846 (9th Cir. 2002). The relevant question is thus "not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000). Given that the doctors' reports and prison records contained contradictory conclusions regarding Demetrulias's mental illnesses, counsel's decision not to present this evidence was

reasonable, especially under the doubly deferential lens that AEDPA requires us to apply.[9]

To be clear, we are not confronted with a case in which trial counsel presented *no* mitigating evidence. *See, e.g.*, *Summerlin v. Schriro*, 427 F.3d 623, 633–36 (9th Cir. 2005) (en banc).  Rather, at the penalty phase, Sandrin presented mitigating evidence regarding Demetrulias's prior criminal offenses and drug use, his remorse, abuse he suffered during his childhood, and testimony designed to engender sympathy for his family.  Sandrin called at least a dozen family, friends, and members of the community to testify as character witnesses on Demetrulias's behalf during the proceeding.  *See Demetrulias*, 39 Cal. 4th at 11–13 (summarizing the penalty phase testimony of Demetrulias's father, mother, sister, sister-in-law, ex-girlfriend, eldest son, family friend Victor Miceli, friend from ninth grade, mother of another friend, Jackie Bridgewater, and an expert in drug and alcohol addiction).

Thus, we cannot conclude that the California Supreme Court unreasonably determined that counsel's performance at the penalty phase was adequate.  The record supports the

---

[9] We disagree with Demetrulias's contention that counsel's failure to present this mitigating evidence was plainly contrary to the Supreme Court's decisions in *Williams v. Taylor*, 529 U.S. 362 (2000), *Porter v. McCollum*, 558 U.S. 30 (2009), and *Rompilla v. Beard*, 545 U.S. 374 (2005).  In all three cases, counsel was unaware of the mitigating evidence at issue due to a constitutionally deficient investigation. *See Williams*, 529 U.S. at 395 ("[Counsel] failed to conduct an investigation . . . not because of any strategic calculation but because they incorrectly thought that state law barred access to such records."); *Porter*, 558 U.S. at 39 ("[C]ounsel did not even take the first step of interviewing witnesses or requesting records."); *Rompilla*, 545 U.S. at 389–90 (Counsel "failed to make reasonable efforts to review the prior conviction file" that it knew the prosecution intended to introduce).

conclusion that counsel's strategic decision not to present the organic brain damage and mental health evidence did not fall "below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, given all the circumstances counsel confronted.  Thus, our review is barred by § 2254(d).

Because we conclude that Sandrin's performance was not deficient, we need not address whether Demetrulias was prejudiced by any deficiency.  And because we conclude that Demetrulias cannot establish a *Strickland* violation, we need not consider whether an evidentiary hearing is warranted. *See Beardslee*, 358 F.3d at 583 ("[The petitioner] is only entitled to an evidentiary hearing if his allegations establish both deficient performance and substantial prejudice.").

## E.  Cumulative Error at Guilt and Penalty Phases

Finally, Demetrulias contends that the cumulative effect of the trial court's guilt and penalty errors deprived him of a fair trial by preventing him from effectively defending against the prosecution's felony murder charge.  The California Supreme Court rejected this claim because it found no constitutional errors, and the single assumed error was harmless.

"The combined effect of multiple errors may justify habeas relief 'if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal.'" *Fairbank v. Ayers*, 650 F.3d 1243, 1257 (9th Cir. 2011) (quoting *Parle v. Runnels*, 505 F.3d 922, 928 (9th Cir. 2007)).  However, because we hold that none of Demetrulias's claims rise to the level of constitutional error, "there is nothing to accumulate to a level of a constitutional violation."  *Ayers*, 650 F.3d at 1257 (quoting *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002)).

## IV.

For these reasons, we **AFFIRM** the district court's order denying Demetrulias's petition for a writ of habeas corpus.